**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricky D. ROSS, Defendant–Appellant.**

**No. 02–50226.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed June 21, 2004.

Frank J. Ragen and Julie A. Blair, San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney; Roger W. Haines, Jr., Assistant United States Attorney, Chief of Appellate Section, Criminal Division; Mark R. Rehe, Assistant United States Attorney, San Diego, CA, for the United States.

Before: KOZINSKI and T.G. NELSON, Circuit Judges, and RESTANI,* Judge.

RESTANI, Judge:

## INTRODUCTION

Defendant Ricky D. Ross was convicted of drug trafficking offenses in 1996. After his first appeal and extensive post-remand proceedings, he now appeals from the district court's denial of his motions to dismiss the indictment or order a new trial, arguing that government misconduct prejudiced his entrapment defense. He also appeals from the district court's post-remand sentencing order, alleging several errors. We affirm the district court's denial of his motions because he was not prejudiced by the government's behavior, including its failure to disclose that a key

---

* The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

informant was rewarded with illegally-obtained permanent resident status. We also affirm the sentencing order as a proper exercise of the district court's discretion.

## FACTS

Ross was arrested along with codefendants Leroy Brown and Curtis James in a reverse drug sting on March 2, 1995. The codefendants provided roughly $170,000 in cash to undercover Drug Enforcement Agency Special Agent Pedro Pena and were in turn allowed to take possession of a Chevy Blazer containing 100 kilograms of cocaine. Appearing with Agent Pena at the deal was undercover informant Oscar Danilo Blandon, a convicted drug trafficker who received significant benefits from the government in return for his cooperation in the arrest and prosecution of the codefendants.

On May 4, 1995, Ross filed a motion with the district court requesting disclosure of impeaching information regarding the confidential informant, later revealed to be Blandon. On June 5, 1995, the district court ordered the government to provide exculpatory testimony regarding Blandon to the defense as soon as possible but no later than July 29, 1995. In response, the government provided Blandon's Alien file ("A–File") to the district court for in camera review. The court then turned selected documents over to the defense. *United States v. Brown*, 163 F.3d 608, 1998 WL 650266, at *1 (9th Cir.1998) (unpublished table decision) ("*Ross I*"). The government did not disclose, however, the specific circumstances surrounding Immigration and Naturalization Service Agent Robert Tellez's procurement of permanent resident status for Blandon, which would have revealed that Tellez violated the law in processing Blandon's file.

Blandon testified as a key government witness at Ross's March 1996 jury trial.

The district court instructed the jury to accept Blandon's testimony only with "great caution" and to consider it in light of the substantial benefits he received from the government in return for his cooperation. Mem. Op. (S.D.Cal. Mar. 20, 2002) ("Mem.Op."). Nevertheless, Ross was convicted of conspiracy to possess cocaine with intent to distribute under 21 U.S.C. §§ 846 and 841(a)(1), possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and criminal forfeiture under 21 U.S.C. § 843(a). The district court denied Ross's first new trial motion, which alleged due process violations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and outrageous government conduct. Mem. Op. & Order (S.D.Cal. Nov. 21, 1996).

Ross appealed his conviction and sentence. He argued in part that the government violated its *Brady* obligations in failing to disclose parts of Blandon's INS A-file along with information depicting Blandon as a notorious drug dealer. He also alleged the government acted outrageously by targeting him for prosecution and by using Blandon, whom Ross linked to the CIA, in that effort. In *Ross I*, we rejected these and other contentions but did find that the district court erred in sentencing Ross under the federal three strikes law. 1998 WL 650266, at *1–*2. We remanded Ross's case to the district court for resentencing on the basis of one predicate offense. *Id.* at *2.

After oral argument but before we issued our decision in *Ross I*, the Justice Department's Inspector General issued a public report on his investigation into allegations that the CIA was protecting the drug trafficking activities of Nicaraguan Contra rebels in the United States. *See* Office of the Inspector General, U.S. Dep't of Justice, The *CIA–Contra–Crack Co-*

*caine Controversy: A Review of the Justice Department's Investigations and Prosecutions* (Dec.1997) (released to the public July 22, 1998) ("*OIG Report*"). The *OIG Report* responded to a series of stories in the San Jose Mercury News that raised questions as to why Blandon, a Nicaraguan citizen who fled his country when the Sandinistas took power, had received such a lenient sentence for his drug trafficking activities, while Ross had been sentenced initially to a life term by the district court. As part of its inquiry, the *OIG Report* examined the circumstances surrounding the issuance of a green card to Blandon.

Blandon entered the United States in June 1979 and applied for political asylum in February 1980. The INS granted him asylum in 1985, but did not document that action until 1988. In September of that year, Blandon applied for legal permanent resident ("LPR") status.[1] The application form required him to list any criminal activities or convictions, but Blandon, not surprisingly, chose not to disclose his active involvement in the narcotics trade. Mem. Op. at 4. Although Blandon would plead to a drug trafficking offense in 1992,[2] he did not have a criminal record at the time of his initial application for LPR status. Consequently, the INS received no disqualifying information during the standard FBI criminal background check.[3] Mem. Op. at 4–5.

Blandon received a green card in October 1994 despite his felony drug trafficking conviction. The *OIG Report* concluded that the issuance of Blandon's green card was without legal authority and, therefore, improper. *OIG Report* at 93. This unlawful adjustment of his resident status resulted from the intervention of INS Agent Tellez. Mem. Op. at 13–14; *OIG Report* at 93. Tellez intervened on behalf of the OCDETF in 1994 so that Blandon could travel internationally in connection with his activities as an undercover informant.[4] Mem. Op. at 12–13. Although lawful procedural alternatives existed to allow Blan-

---

1. Consistent with the practice of the district court, we use "legal permanent resident status" and "green card" interchangeably.

2. The Organized Crime Drug Enforcement Task Force ("OCDETF") investigated Blandon in 1991, and the federal government indicted him and his wife the following year for several drug trafficking offenses. He was arrested in May 1992, after being lured to an INS office on the pretext that he was to receive his green card. Mem. Op. at 7. Blandon agreed to become a confidential informant for the OCDETF, and in return pled only to conspiracy to distribute 125 kilograms of cocaine. The government dismissed the remaining counts against him and all charges against his wife. *Id.* The government requested a sentencing departure based on Blandon's "substantial assistance" and, in December 1993, the presiding court imposed a 48–month sentence to be followed by five years' supervised release. *Id.* at 9.

3. Normally, an alien with an "aggravated felony conviction" is not eligible to receive LPR status. *OIG Report* at 94. The Immigration and Naturalization Act defines an "aggravated felony" to include illicit trafficking in a controlled substance. 8 U.S.C. § 1101(a)(43)(B) (2000). Ordinarily, an alien convicted of an aggravated felony should be deported and is prohibited from reentering the United States for twenty years. 8 C.F.R. § 212.2(a) (2000).

4. INS standard procedure provided that certain elements of a confidential informant's criminal record could be kept out of the informant's A-file to protect his or her undercover status. Mem. Op. at 9. The district court observed that, even if a record of Blandon's drug trafficking judgment had been included in his A-file, the INS likely would not have reviewed the A-file again before issuing a green card to him in October 1994. Mem. & Op. at 10. While these considerations indicate that Blandon might have received his green card by chance instead of by Tellez's intervention, the issuance of the green card nevertheless violated federal law.

don to remain in the United States, if not travel abroad,[5] Tellez addressed Blandon's need for travel documentation by helping him obtain the green card. *Id.* at 13–14; *OIG Report* at 93. Neither the district court nor the *OIG Report* found evidence that any government agent directed Tellez to obtain a green card or otherwise violate U.S. immigration law in arranging for safe international travel for Blandon. Mem. Op. 13; *OIG Report* at 95. Having apparently acted on his own, Tellez was demoted through INS disciplinary procedures. Mem. Op. at 17. The Justice Department determined that his conduct was not prosecutable as a criminal matter. *OIG Report* at 95 n.26.

Tellez's improprieties were eventually brought to the attention of the U.S. Attorney's Office for the Southern District of California ("USAO"), which prosecuted Ross. In November 1997, several months before oral argument in *Ross I*, the OIG provided a draft of its report to the USAO. *OIG Report,* Executive Summary at 3. On December 8, 1997, the USAO and other agencies objected to release of the report

on the grounds that it would endanger Blandon in his ongoing undercover work and hamper a DEA investigation. *Id.* These concerns ultimately delayed the report's release until July 22, 1998, though its contents remained unchanged from December 17, 1997. *Id.,* Executive Summary at 2. In the meantime, the USAO argued *Ross I* before us on April 7, 1998, without informing us that a member of the OC-DETF likely illegally obtained a green card for Blandon.

After the sentencing issue had been remanded to the district court, Ross seized upon the *OIG Report* and moved for (1) dismissal of the indictment or a new trial based on *Brady* violations, as well as (2) dismissal for outrageous government conduct pursuant to the court's supervisory powers. To support his *Brady* claims, Ross argued that he was prejudiced by his inability to fully expose to the jury the benefits Blandon received in exchange for his role in the case against Ross. Ross centered his outrageous government conduct claim on the illegal manner in which

5. While Blandon could have exited the United States with his Nicaraguan passport, he needed INS assistance to return to the United States in a manner that would preserve his undercover status. The *OIG Report* identified four lawful measures that could have served this purpose: (1) have the INS issue an Order to Show Cause ("OSC") for Blandon's deportation, but hold the OSC in abeyance upon request of the U.S. Attorney's Office to preserve Blandon's political asylee status and his eligibility for asylee travel documentation; (2) obtain the approval of the INS Assistant District Director for Investigations to delay deportation proceedings until the conclusion of Blandon's cooperation, similarly preserving Blandon's political asylee status and his eligibility for asylee travel documentation; (3) deport Blandon, but then have the DEA request that he be paroled back into the United States for the period of his cooperation; and (4) have the INS issue an OSC and obtain a deportation order from an immigration judge, but then stay the order. *OIG Report* at 95–96.

The third option, actual deportation, was rejected by INS officials because it might compromise Blandon's cover. Mem. Op. at 13. By explicitly contemplating international travel, these options are distinguishable from the four methods cited by the district court through which the government could have lawfully avoided Blandon's deportation: (1) use the discretion of the Attorney General and/ or the Director of the INS not to deport a convicted felon who cooperates with the government on criminal investigations pursuant to 8 U.S.C. § 1226(c)(2) (2000); (2) use the discretion of the Director of the INS not to institute deportation proceedings against an asylee despite a conviction under 8 U.S.C. § 1158(c)(2); (3) secure a grant by the Attorney General of a three-year S–Visa under 8 U.S.C. § 1101(a)(15)(S)(i)(I); and (4) have the Attorney General request a pardon from the President. See Mem. Op. at 95. The district court did not indicate whether any of these options would have allowed Blandon to travel abroad.

INS Agent Tellez obtained Blandon's permanent resident status and the prosecution's failure to disclose this information.

In response, the district court conducted lengthy evidentiary hearings. At the conclusion of the hearings, the district court denied Ross's motions. The court concluded that none of the facts uncovered by the hearings—including the illegal manner in which Tellez procured Blandon's permanent resident status—would have altered the jury's guilty verdict or enabled Ross to establish an entrapment defense. Mem. Op. at 23. Because the court found Ross was not prejudiced by the government's behavior, it also declined to exercise its supervisory powers. *Id.* at 28. The district court later re-sentenced Ross to 240 months in prison and six years supervised release according to United States Sentencing Guidelines. Sentencing Order (S.D.Cal. May 3, 2002). Ross appeals.

## DISCUSSION

### I. JURISDICTION

■ We review a district court's assumption of jurisdiction de novo. *United States v. Stump,* 914 F.2d 170, 172 (9th Cir.1990). The issues raised in Ross's appeal rest on three distinct jurisdictional bases: (A) a motion for a new trial pursuant to Rule 33; (B) a motion to dismiss the indictment based on *Brady* due process violations, or on the court's supervisory powers as an adjunct to the Rule 33 motion; and (C) an appeal of the district court's post-remand sentencing decision pursuant to 18 U.S.C. § 3742(a).

### A. Motion for New Trial and Rule 33

■ The Government argues that the district court lacked jurisdiction to hear Ross's post-remand *Brady* motion for dismissal or a new trial. The authority of district courts to consider post-remand motions for a new trial must derive from the mandate of the appeals court, 28 U.S.C. § 2106 (2000), or from Federal Rule of Criminal Procedure 33. *Cf. Stump,* 914 F.2d at 172 (discussing Federal Rule of Criminal Procedure 35 and observing that district courts "do not have inherent power to resentence defendants at any time").

In *Ross I,* we vacated Ross's sentence and remanded for resentencing. 1998 WL 650266, at *3. Our order did not vest the district court with jurisdiction to consider issues beyond resentencing. Rule 33 is then the only potential source of jurisdiction for the new trial motion.

Rule 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Crim.P. 33(a). The rule explicitly contemplates that newly discovered evidence may be a proper basis for a new trial. Fed.R.Crim.P. 33(b)(1). Ross filed a motion for a new trial on July 26, 1999, claiming he was prejudiced by newly discovered evidence that came to light only after oral arguments for *Ross I.* Order Re: Timeliness of Motion for New Trial (S.D.Cal. Nov. 24, 1999). The district court found the motion timely under the rule's pre-amendment filing requirements and assumed jurisdiction. *Id.* The court did not abuse its discretion in applying the pre-amendment filing deadline to Ross's motion.[6] The new trial motion is properly

---

6. On December 1, 1998, Rule 33 was amended to require that "any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). The United States Supreme Court commanded that the amendment was to "take effect on December 1, 1998, and shall govern all pro-

ceedings in criminal cases thereafter commenced, and, in so far as just and practicable, in all proceedings in criminal cases then pending." Fed.R.Crim.P., Order Adopting and Amending Rules (Apr. 24, 1998).

Ross's case was pending when the amendment to Rule 33 became effective. The issue

before us.

Even if Rule 33 offers a proper jurisdictional basis, the government argues that Ross's *Brady* claims were precluded by the law of the case. In *Ross I*, we determined that further impeachment of Blandon was irrelevant and therefore immaterial to the question of Ross's guilt. 1998 WL 650266, at *1 (holding that "the evidence of guilt would have been overwhelming even if Blandon's credibility had been demolished"). Nevertheless, Ross insists that the government's failure to disclose the green card improprieties prejudiced his ability to impeach Blandon. Appellant Br. at 38 ("This information would have been used against Blandon to attack his credibility. . . ."). The district court should not have considered Ross's arguments in this regard, and we do not review them.[7] Impeachment was not the only purpose Ross contemplated for the suppressed information, however, and we re-

view the Brady claim as it relates to his entrapment defense. Appellant Br. at 26.

### B. Motion to Dismiss the Indictment

 In agreeing to hear Ross's new trial motion, the district court did not discuss Ross's request that it dismiss the indictment on the basis of a *Brady* violation or through the use of its inherent supervisory powers. Order Re: Timeliness (S.D.Cal. Nov. 24, 1999). As with the motion for a new trial, the motions to dismiss are not within the scope of our remand for re-sentencing and must similarly rest on an alternate jurisdictional foundation. The district court apparently considered the motions to dismiss as part of the Rule 33 motion for a new trial. Mem. Op. at 2 n.1. Federal Rule of Criminal Procedure 33, of course, makes no mention of motions to dismiss. It would be unreasonable, though, to conclude that, in properly asserting jurisdiction over a new trial motion

here is whether it is just and practicable to apply the amended version of Rule 33 to the instant case. If the application of the newly amended Rule 33 is not just and practicable, "cases then pending" are instead governed by the earlier version of Rule 33. That version permitted new trial motions to be filed up to two years "after final judgment." This period begins to run upon the issuance of our mandate of affirmance. *United States v. Cook,* 705 F.2d 350, 351 (9th Cir.1983).

The instant motion is untimely under the current Rule 33, but timely under the rule's prior incarnation. The jury found Ross guilty as charged on March 19, 1996. Pursuant to the amended Rule 33, the period for a new trial motion expired on March 19, 1999. Ross missed this deadline and did not file the instant motion for a new trial until July 26, 1999. The filing would have been timely under the old Rule 33, which would have given Ross two years to file after we decided *Ross I* on September 9, 1998. The district court held it would not be "just and practicable" to apply the amended Rule 33 to bar jurisdiction over Ross's motion.

In commanding that the amended rule be applied to pending cases "in so far as just and

practicable," the Supreme Court evinced a preference for application of the amended rule. The Court did not reserve application of the new rule to only those cases in which the defendant has been negligent or unduly tardy in filing. Nevertheless, we find no authority to suggest that the district court's interpretation of "just and practicable" was an abuse of discretion in this case. Accordingly, the court's assumption of jurisdiction over the motion for a new trial was proper.

7. The law of the case generally precludes a court from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case. *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.1993). There are several exceptions to this principle, and Ross argues that two apply here. Appellant Reply Br. at 5. A court may have discretion to revisit an issue if (1) the evidence on remand is substantially different; or (2) a manifest injustice would otherwise result. *Thomas,* 983 at 155. The impeachment evidence here is not substantially different from what we considered in *Ross I,* and no manifest injustice will result if we leave *Ross I* undisturbed.

that alleges new evidence, a court may not also reserve the right to dismiss the indictment if subsequent proceedings warrant such a remedy.

■■■ Dismissal of an indictment is warranted where outrageous law enforcement conduct violates due process. *See United States v. Simpson,* 813 F.2d 1462, 1464–65 (9th Cir.1987) (*"Simpson I"*). Even where no due process violation exists, a federal court may dismiss an indictment pursuant to its supervisory powers. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). As with the power to dismiss an indictment for due process violations, supervisory powers do not flow from Rule 33. Supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system: "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The supervisory powers provide a wider range of remedial options than would otherwise exist, but are not typically considered to be an independent basis for post-conviction review. *See id.* (observing that "the scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity").

Because the district court had jurisdiction to hear the Rule 33 motion, it could consider the motions to dismiss. Accordingly, we need not address whether a wholly independent basis for jurisdiction exists for these motions.

C. Sentencing–Related Claims

We have jurisdiction over Ross's sentencing-related claims under 18 U.S.C. § 3742(a) (2000), as an appeal from a sentence imposed pursuant to United States Sentencing Guidelines.

II. MERITS

Ross alleges that the district court erred in four ways: (A) by denying the motion to dismiss the indictment or order a new trial on the basis of purported *Brady* violations; (B) by declining to use its supervisory powers to dismiss the indictment on the basis of outrageous government conduct; (C) by refusing to allow two defense witnesses at the evidentiary hearing; and (D) by its disposition of several sentencing issues. We consider each allegation of error in turn.

A. *Brady* Violations

■■■ Ross seeks a dismissal of his indictment or, in the alternative, a new trial based on the alleged failure of the government to comply with its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose favorable material information to the defendant. We review alleged violations of Brady de novo. *United States v. Arias–Villanueva,* 998 F.2d 1491, 1506 (9th Cir. 1993). Because we conclude no Brady violation occurred, we do not evaluate whether Ross's *Brady* claim meets the requirements for dismissal of an indictment based on a due process violation or the requirements for a new trial.

■■■ Under *Brady,* a defendant's due process rights are violated if the government failed to disclose evidence that is material and favorable. 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material and favorable if there is a reasonable probability that the disclosure of the evidence would have changed the trial's result. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The materiality of omitted evidence is assessed in the light of other evidence, not merely

in terms of its probative value standing alone. *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." (footnote omitted)). The reasonable probability standard ultimately asks us to determine whether, in the absence of the undisclosed evidence, the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

The issue that drove the extensive post-remand proceedings before the district court was the government's illegal procurement of a green card for Blandon, a principal government witness. Ross claims this new information is materially favorable to him both in terms of its effect on Blandon's credibility, *see Bagley*, 473 U.S. at 676, 105 S.Ct. 3375 (applying *Brady* rule to impeachment evidence), and his entrapment claim.

▪▪▪ *Ross I* made further impeachment of Blandon irrelevant and therefore immaterial with regard to the question of Ross's guilt, concluding: "the evidence of guilt would have been overwhelming even if Blandon's credibility had been demolished." 1998 WL 650266, at *1. A *Brady* violation does not exist if the newly discovered evidence is immaterial. *See Kyles*, 514 U.S. at 440–41, 115 S.Ct. 1555. *Compare United States v. Schwartzbaum*, 527 F.2d 249, 255 (2d Cir.1975) (holding new impeachment evidence immaterial for purposes of a motion for a new trial where there is pervasive evidence of defendant's

guilt and disclosure of substantial cash deposits of government witness), *with United States v. Young*, 17 F.3d 1201, 1205 (9th Cir.1994) (granting new trial to defendant because introduction of false testimony was highly prejudicial in light of government's otherwise weak case). While *Ross I* does not preclude our consideration of Blandon's credibility as it relates to the factual bases for sentencing, Ross failed to allege a *Brady* violation in this respect.[8] *See United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir.1995) (we need not consider issues not specifically raised and argued in the appellant's briefs). The only remaining *Brady* issue is the effect of the new evidence on Ross's entrapment defense.

▪▪▪ Entrapment has two elements: (1) government inducement to commit the crime; and (2) the absence of predisposition to commit the crime. *United States v. Thickstun*, 110 F.3d 1394, 1396 (9th Cir. 1997). If the defendant is able to put entrapment in issue, the government bears the burden of negating the defense beyond a reasonable doubt. *See Jacobson v. United States*, 503 U.S. 540, 548–49, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); Thickstun, 110 F.3d at 1396. A *Brady* violation would exist in this case if the new information undermines confidence in the jury's conclusion that Ross was not entrapped. *Cf. United States v. Brunshtein*, 344 F.3d 91, 101–02 (2d Cir.2003) (finding no *Brady* violation where allegedly suppressed evidence would not have enabled defendant to establish entrapment).

### 1. Inducement

Tellez's illegal conduct and the prosecution's failure to disclose that conduct were only relevant, if at all, to the inducement

---

**8.** While we do not examine the factual bases underlying the district court's sentencing decision for a *Brady* violation, we do examine whether new impeachment evidence reveals a clearly erroneous application of United States Sentencing Guidelines. *See infra* at 1113–114.

element of the entrapment defense, and here it has little probative value. Ross does not argue that Tellez's conduct itself constituted inducement, but infers only that it was indicia of a pattern of government misconduct in the course of Ross's prosecution.[9] Such an attenuated argument is insufficient "to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. One is required to make several additional inferences, unfounded in the evidence, to conclude that the government actually induced Ross to participate in the cocaine deal.

### 2. Absence of Predisposition

Tellez's illegal treatment of Blandon's A-file, while perhaps allowing for speculation that the government would take other unlawful steps to induce Ross into the cocaine deal, does not refute the enthusiasm for the deal Ross displayed on audio tape. The district court observed that, "Ross's own testimony damaged his defense because his explanations of the meaning of the tape recorded conversation were incredible." Mem. Op. at 23. This is substantial evidence of predisposition independent of Blandon's testimony. Ross's *Brady* argument does not even attempt to counter the evidence of his disposition to engage in the drug deal. Indeed, nothing in the post-remand proceedings suggests a reasonable probability of a showing of lack of predisposition where Ross could not do so before.

\* \* \*

The district court did not err in refusing to find the materiality necessary for a *Brady* violation. We agree with the district court's conclusion that Ross's entrap-

ment defense failed because of his predisposition to commit the crime, not because Blandon was motivated by the receipt of his green card to induce Ross to commit the crime. Mem. Op. at 23; *see Wolcher v. United States,* 233 F.2d 748, 751 (9th Cir. 1956) (holding that a district judge who presided at trial may rule on a new trial motion by assessing the probative value of new evidence in light of the judge's understanding of the case gained at trial).

### B. Outrageous Government Conduct

▮ Ross argues that the district court should have used its supervisory powers to dismiss the indictment for outrageous government conduct. We review the district court's refusal to exercise its supervisory powers for abuse of discretion. *United States v. Restrepo,* 930 F.2d 705, 712 (9th Cir.1991); *Simpson I,* 813 F.2d at 1465 n. 2. Factual findings upon which the decision was based are reviewed for clear error. *Restrepo,* 930 F.2d at 712.

▮ "Federal courts have inherent but limited supervisory powers to formulate procedural rules." *United States v. Morales,* 328 F.3d 1202, 1205 (9th Cir.), *cert. denied* —— U.S. ——, 124 S.Ct. 491, 157 L.Ed.2d 391 (2003). A court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation. *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir. 1991). Though Agent Tellez's misconduct did not occur in the midst of the trial, the supervisory power may be used "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws) governing matters apart from

---

9. Ross argues that, "[i]f the jury knew the way Blandon had acquired this permanent residency status, it would have dovetailed very concretely with the defense theory the government was outside the bounds of propriety and the law in prosecuting Ross." Appellant Br. at 26.

the trial itself." *United States v. Williams*, 504 U.S. 36, 46, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992).

■■■■ To justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause "substantial prejudice" to the defendant. *See Barrera–Moreno*, 951 F.2d at 1093. Because no government misconduct prejudiced Ross, dismissal of the indictment is not warranted. *See United States v. Tucker*, 8 F.3d 673, 674–75 (9th Cir. 1993) (en banc) (describing prejudice as "a trigger to the exercise of supervisory power"); *see also United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir.1988) (describing dismissal of an indictment as a "disfavored" and "drastic" remedy). Nevertheless, we find it necessary to express our concern regarding the prosecutors' handling of the Blandon green card issue.

### 1. Substantial Prejudice

Ross alleges that the illegal procedures used to procure permanent resident status for Blandon and the prosecution's failure to disclose those facts constitute prejudicial error.

■■■■ A district court may not use its supervisory authority to dismiss an indictment for prosecutorial misconduct "not prejudicial to the defendant." *Bank of Nova Scotia*, 487 U.S. at 255, 108 S.Ct. 2369. The supervisory authority may only dismiss an indictment in response to prejudicial conduct because "[e]ven a sensible and efficient use of the supervisory power ... is invalid if it conflicts with constitutional or statutory provisions," including the harmless error rule prescribed by Federal Rule of Criminal Procedure 52(a). *Id.* at 254, 108 S.Ct. 2369 (quoting *Thomas v. Arn*, 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)). Where the defendant asks the district court to use its supervisory powers to dismiss an indictment for outrageous government conduct, the prop-

er prejudice inquiry is whether the government conduct "had at least some impact on the verdict and thus redounded to [the defendant's] prejudice." *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir.1993) (alteration in original) (quoting *United States v. Owen*, 580 F.2d 365, 368 (9th Cir.1978)); *cf. Bank of Nova Scotia*, 487 U.S. at 263, 108 S.Ct. 2369 ("The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict."). Though this is a less stringent standard than the *Brady* materiality standard applied above, the claim fails for similar reasons.

#### a. Prejudice as to Ross's Impeachment of Blandon

As noted above, any prejudice to Ross stemming from government action that restricted his ability to impeach Blandon is precluded by our conclusion in *Ross I*, that even the complete destruction of Blandon's credibility would not change the verdict. *See supra* at Part II.A.

#### b. Prejudice as to Ross's Entrapment Defense

■■ In evaluating the possible prejudicial effect of government misconduct on an entrapment defense, we focus on "the predisposition of the defendant to engage in the criminal activity with which he is charged," and not on the misconduct. *United States v. Slaughter*, 891 F.2d 691, 697 (9th Cir.1989). The entrapment defense protects the "unwary innocent," not the "unwary criminal." *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Garza–Juarez*, 992 F.2d 896, 908 (9th Cir. 1993). The issue is whether disclosure of the illegal processing of Blandon's residency status would have affected the jury's determination that government officials did not "implant[ ] in the mind of an inno-

cent person the disposition to commit the alleged offense and induce[ ] its commission in order that they may prosecute." *United States v. Benveniste*, 564 F.2d 335, 340 (9th Cir.1977) (quoting *Russell*, 411 U.S. at 435, 93 S.Ct. 1637).

As detailed above, *see supra* at Part II.A(2), the problem with Ross's argument is that both Tellez's and the prosecutors' conduct lacks a probative relationship with regard to Ross's predisposition to commit the crimes in question. We find no prejudice where the governmental misconduct is so distant and vague in its relation to the entrapment defense. *See Owen*, 580 F.2d at 368 (finding no prejudice where defendant could not show any effect beyond "vague claim" of a strained relationship with his attorney).

### 2. The Prosecutors

 While Ross's outrageous government conduct claim fails for lack of prejudice, we think it imprudent to let the prosecution's behavior pass without comment. A prosecutor is " 'deemed to ̇have knowledge of and access to anything in the custody or control of any federal agency participating in the same investigation of the defendant.' " *United States v. Zuno–Arce*, 44 F.3d 1420, 1427 (9th Cir.1995) (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir.1989)). The prosecutor's disclosure obligation turns on his or her actual knowledge of, and access to, the information at issue. *See id.* Actual knowledge is particularly significant when determining whether the prosecution's behavior constitutes flagrant misconduct.

Up to a point, it is unclear whether the prosecution knew of Tellez's misconduct. The district court made no factual finding that the prosecution intentionally failed to disclose the specifics of Tellez's misconduct and noted only the tangential misconduct on the part of Tellez. Both the *OIG Report* and the district court found that Tel-

lez did not violate the law at the behest of the prosecution. Mem. Op. at 13. The court also found the Assistant U.S. Attorney to be credible when he claimed to have relied on a misrepresentation from Tellez that Blandon had lawful permanent resident status before his 1992 arrest. Mem. & Op. at 11. Further review, however, reveals questionable conduct that can only be considered not flagrant when other factors are taken into account.

Beginning at least with the circulation of the draft *OIG Report* in November 1997, the USAO had abundant notice of Tellez's misconduct and yet failed to alert this court when its prosecutors argued the appeal in *Ross I* in April 1998. This failure deprived us of the opportunity to determine, in camera, whether it was relevant that a member of the prosecution's task force violated a law of the United States in conferring a benefit upon a key government witness against Ross. The district court did not take issue with this omission because "it had no effect on the jury's verdict." Mem. & Op. at 28.

 Prosecutors may, however, be sanctioned even if their misconduct does not prejudice the defendant: "In cases involving prosecutorial misconduct which is neither flagrant nor prejudicial, a district judge can still sanction the misconduct, but the sanction must be proportionate to the misconduct." *Jacobs*, 855 F.2d at 655 (citing *United States v. Cadet*, 727 F.2d 1453, 1470 (9th Cir.1984)); *see also Bank of Nova Scotia*, 487 U.S. at 263, 108 S.Ct. 2369 (favoring remedies short of dismissal of an indictment, including criticism of a prosecutor in a published opinion, because they "allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced defendant"). Sanctions may be necessary to punish prosecutors who fail to fulfill their duty "to win fairly, staying well within the rules."

*United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir.1993); *see also United States v. Isgro,* 974 F.2d 1091, 1098 (9th Cir. 1992), *amended by* 1992 WL 208434, 1992 U.S.App. LEXIS 30916, No. 90–50531 (9th Cir. Nov. 25, 1992) (sanctioning a prosecutor by name for, among other things, lying to the district court about *Brady* material and attempting to keep that material from the defense through trial).

■■■ We decline to sanction the prosecutors for their conduct in this case because their omission was based, at least in part, on legitimate law enforcement concerns. The USAO, along with other agencies, objected to the OIG's proposed December 1997 publication of the *OIG Report* on the grounds that its release would both hamper an ongoing DEA investigation and endanger Blandon in his undercover work for that investigation. *OIG Report,* Executive Summary at 3. These concerns were so substantial that the Attorney General took the extraordinary step of delaying the public release of the *OIG Report. Id.* at 1, 4. While we would have preferred the opportunity to consider the green card revelations in camera, the weight of these law enforcement interests militates against the imposition of sanctions. Instead, we warn government prosecutors that, in the future, they may be subject to sanctions if they fail to inform a federal court that a government agent violated federal law in providing a benefit to a government witness.

\* \* \*

This case does not reveal the kind of widespread pattern of wrongdoing that would call for a new trial to send a message to the appropriate government agencies. It would be gratuitous in this instance to go through the motions of a new trial in the hope that U.S. Citizenship and Immigration Services—the successor to the INS—or the USAO would take notice

and more vigorously exhort their personnel to observe legal and procedural standards. If prosecutors are under a duty to see that "guilt shall not escape or innocence suffer," *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), we cannot impugn the decision of the district court to preserve the indictment of one who is, according to *Ross I,* clearly guilty.

Ross unsuccessfully tries to analogize his case to *Kojayan,* where we remanded a case of prosecutorial misconduct to the district court with instructions to retry the case or dismiss as a sanction for misconduct. 8 F.3d at 1325. There, we chose such a remedy because the prosecuting attorney presented potentially decisive declarations by hearsay and then obstructed the defendant's access to the declarant. *Id.* at 1323. *Kojayan* was a close case, *id.,* but this is not. As in *Garza–Juarez,* we find no prejudicial error in the district court's denial of the motion to dismiss even though we remain troubled by the behavior of the USAO. *See* 992 F.2d at 907 (finding no error regarding district court's denial of motion to dismiss for outrageous government conduct and vindictive prosecution).

C. The District Court's Refusal to Allow Two Defense Witnesses to Testify

■■■ Ross argues that the district court's refusal to allow post-remand testimony from Sheldon Grover and Oscar Blandon was reversible error that left the record incomplete and violated his rights under the Fifth Amendment Due Process Clause and the Sixth Amendment Compulsory Process Clause. We review the district court's decision for abuse of discretion. *United States v. Hankey,* 203 F.3d 1160, 1166–67 (9th Cir.2000); *United*

*States v. Hernandez,* 109 F.3d 1450, 1452 (9th Cir.1997).

A party in a criminal case does not have unfettered discretion to call witnesses. Federal Rule of Evidence 403 allows a district court to bar testimony where its probative value is substantially outweighed by the delay it will cause and the risk of confusing the finder of fact. The evidence to be offered by Grover and Blandon would have been cumulative or irrelevant, and the district court was well within the bounds of its discretion under Rule 403 when it barred the proffered testimony. Ross fails to indicate with any particularity what essential facts these two witnesses would have adduced. Accordingly, he fails to demonstrate that he was prevented from mounting a defense in violation of the Due Process Clause of the Fifth Amendment. We find Ross's Sixth Amendment Compulsory Process Clause claim to be wholly without merit.

### D. Sentencing Issues

#### 1. Alleged Apprendi Violation

Ross claims the district court violated the requirements of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in not having a jury determine the amount of drugs ultimately attributable to him. *Apprendi* requires that any fact other than a prior conviction be submitted to a jury and proved beyond a reasonable doubt if it increases the penalty beyond the prescribed statutory maximum. *Id.* at 490, 120 S.Ct. 2348.

Because this case was tried before *Apprendi* was issued, it is understandable that Ross did not request a jury instruction on the amount of cocaine to be used in determining his sentence. Even if such a request had been made and denied, however, the post-remand sentence would still fail to trigger *Apprendi's* protections. Ross was charged with possession of a detectable amount of cocaine in excess of five kilograms with intent to distribute, which carries a maximum sentence of 360 months when the defendant has a prior felony drug offense. 21 U.S.C. § 841(b)(1)(c). A jury found Ross guilty of possession of the required minimum detectable amount, and he had already been convicted of one prior felony drug offense. Upon remand, the district court sentenced Ross to 240 months based on United States Sentencing Guidelines calculations, well below the statutory maximum of 360 months. A defendant has no *Apprendi* claim where his actual sentence is less than the prescribed maximum for trafficking in an unspecified quantity of cocaine. *United States v. Antonakeas,* 255 F.3d 714, 728 (9th Cir.2001); *see also United States v. Scheele,* 231 F.3d 492, 497 n. 2 (9th Cir.2000) (regarding methamphetamines). Thus, the district court's sentencing order does not violate *Apprendi.*

#### 2. Decision Not to Depart Downward from Guideline Ranges

We do not review the sentencing court's discretionary decisions not to depart downward from Guideline ranges, *United States v. Lopez,* 106 F.3d 309, 310 (9th Cir.1997), including the district court's decision not to depart for sentencing entrapment. We may only review a decision not to depart if the district court erroneously believed it lacked the authority to depart. *See id.* There is no indication that the district court erroneously believed it lacked the discretionary authority to depart downward, and therefore no review of this issue is warranted.

#### 3. Determination of Ross's Base Offense Level

Though the district court's decision not to depart for sentencing entrapment is unreviewable, we review for clear error the factual finding underlying the

sentencing decision, namely that Ross was predisposed to commit offenses involving 100 kilograms of cocaine. *See United States v. Angwin,* 271 F.3d 786, 808–09 (9th Cir.2001) (finding sufficient evidence of dangerous conduct to support an upward adjustment of the defendant's sentence), *cert. denied,* 535 U.S. 966, 122 S.Ct. 1385, 152 L.Ed.2d 375 (2002); *United States v. Maldonado,* 215 F.3d 1046, 1050 (9th Cir.2000) (upholding the factual determinations underlying the upward adjustment of the defendant's base offense level for his leadership role in the offense). As part of his sentencing entrapment argument, Ross disputes the district court's finding and questions why the court gave sentencing entrapment departures to his codefendants, Brown and James. Ross maintains that the full value of the transaction was $170,000. This was roughly the amount brought by the codefendants on the day of the arrest. Under any likely valuation of a kilogram of cocaine at the time, $170,000 would be an insufficient price for 100 kilograms of cocaine.

The district court's finding formed the basis for the court's arrival at a Guidelines base offense level of 36. *See* 18 U.S.C. § 2D1.1(c)(2) (2000). The district court found the indictment was "supported by independent evidence of Ross's ardent ambition to distribute large quantities of cocaine for personal profit," Mem. Op. at 28, but did not specify whether the independent evidence supported Ross's disposition to distribute 100 kilograms of cocaine, the amount upon which his sentence was based. Nevertheless, sufficient evidence exists independent of Blandon's suspect testimony to prevent the conclusion that the district court clearly erred in finding Ross's predisposition to an amount of cocaine within base offense level 36.

The jury listened to a tape recording of a February 28, 1995, meeting in which codefendants Ross, Brown, and James ne-gotiated a down-payment cocaine transaction with Blandon and undercover DEA Agent Pena. Trial Tr. III–47. On cross-examination, Ross contradicted his assertions that the codefendant's $170,000 constituted the full amount of the transaction:

Q: And, in fact, there was a lot of discussion about when the rest of the money would be available, isn't there?

A: Correct.

Q: And if it's a cash deal you don't need to talk about the rest of the money because a cash deal is cash and carry.

A: Correct.

Q: And, in fact, you were a participant in that conversation as to how much money would be delivered later.

A: Basically, I relayed to Blandon what Chico said, yes.

Trial Tr. VII–114–15. In addition, the jury heard a tape recording of a telephone conversation between Ross and Blandon on March 2, 1995, the day of the arrest, in which Ross stated, "[w]e can do the whole thing, man, no problem." Trial Tr. III–32. Though it is incongruous that the district court granted sentencing entrapment departures for Brown and James and not Ross, we can find no clear error in the court's determination that Ross was predisposed to participate in a deal for 100 kilograms of cocaine.

4. Prior Conviction as a Predicate Offense/Sentence Enhancement

In *Ross I* we held that Ross's prior drug conspiracy convictions constituted one prior predicate offense under 21 U.S.C. § 841. We did not remand for further consideration of this matter, and we do not now consider new arguments.

CONCLUSION

The district court's resentencing order and its denial of Ross's motions to dismiss

or order a new trial are affirmed. There are no merits to any other issues raised by Ross on appeal.

AFFIRMED.