**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

GWAINE LAVON COLLINS,
a/k/a Gwaine Collins,
            *Defendant-Appellant.*

No. 06-50339

D.C. No.
CR-04-01222-RGK-
01

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
March 6, 2008—Pasadena, California

Filed January 7, 2009

Before: John R. Gibson,* Diarmuid F. O'Scannlain, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Gibson;
Concurrence by Judge Graber;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

---

*The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

65

**COUNSEL**

Karen L. Landau, Oakland, California, for the defendant-appellant.

Patrick R. Fitzgerald, Assistant U.S. Attorney, Criminal Division, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

GIBSON, Circuit Judge:

Gwaine Lavon Collins was indicted, along with four other individuals, for six counts of conspiracy to possess with intent to distribute and to distribute methamphetamine, 21 U.S.C. §§ 846 and 841(a)(1), and possession of methamphetamine, 21 U.S.C. § 844. He was tried on the conspiracy count and on two counts of distribution: first, for distributing 919 grams of methamphetamine on August 10, 2004, and second, for distributing 3,124 kilograms of methamphetamine on August 17, 2004. Collins was convicted of each count after a trial by jury. At trial, Collins admitted to his participation in the drug sales, but he argued that he was entrapped to perform those sales by government informant James Kim. On appeal, he raises three arguments: (1) the district erred in refusing to require the government to state its reason for striking the sole remaining African-American from the potential jury, *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the government suppressed an audiotape recording of a conversation between Kim and another drug dealer in contravention of Collins's constitutional rights under the compulsory process clause, *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and the confrontation clause; and (3) the district court erred when it refused to require the government to accept a subpoena for confidential informant Danny Yim, a principal witness in the uncharged misconduct of the defendant that Collins argued supported his entrapment defense. We affirm in all respects except the *Batson* issue, on which we reverse and remand for an evidentiary hearing.

We need not recount Collins's participation in the two August methamphetamine transactions because Collins does not dispute his involvement in those sales. Rather, we set forth the facts alleged at trial that are necessary to understand Collins's entrapment defense, which is largely drawn from Collins's own testimony.

Collins and Kim befriended one another while incarcerated in the Metropolitan Detention Center in Los Angeles, California. While in prison, Kim and Collins discussed Kim helping Collins become involved with Kim's import/export business of (non-narcotic) goods. According to Collins, when he was released he soon contacted Kim, and they proceeded together on several potential business ventures, none of which appears to have been executed. Unbeknownst to Collins, Kim was already preparing to work as a government informant as far back as their time in prison together.

The crux of Collins's entrapment claim is that, according to Collins, in late June 2004, Kim became distraught because he needed a lot of money to pay off the escrow on his restaurant, which was subject to a lien. According to Collins, Kim asked him to find some drugs they could sell. Collins claimed Kim was agitated and intoxicated when he told him about the restaurant problem. Despite Kim's predicament, Collins claimed that he initially refused because he had no desire to get back into the drug business. But, Collins testified, Kim repeatedly called him, with some new "drama," and continued to ask him about selling drugs. Collins testified that he tried to convince Kim that they could make the money Kim needed

through their other ventures and even offered to give Kim his share of the profits from a DVD import deal they had previously discussed. Kim, however, was unresponsive to any of Collins's inquires regarding the other business. Finally, Collins relented and helped Kim procure methamphetamine in July, although Collins claimed that he received no money from that deal, but rather did it solely to help the distraught Kim. After the uncharged deal in July, Collins claimed that he initially refused to be involved further with drugs. Collins relented again and participated in the two August deals, which formed the basis for his convictions. He admitted that he intended to invest his own money in a pound of methamphetamine so he could sell it. Kim testified that Collins never said he did not want to do the drug deals, but that "he always wanted to do it."

## I.

**[1]** "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89. When a defendant alleges a *Batson* violation, a three-part burden shifting test is used to determine if the potential juror was challenged on the basis of impermissible discrimination. At the outset, the defendant must make a prima facie showing that the challenge was based on an impermissible ground, such as race. *Id.* at 96. "This is a burden of production, not a burden of persuasion." *Green v. Lamarque*, 532 F.3d 1028, 1029 (9th Cir. 2008); *accord Johnson v. California*, 545 U.S. 162, 170-71 (2005). "Second, if the trial court finds the defendant has made a prima facie case of discrimination, the burden then shifts to the prosecution to offer a race-neutral reason for the challenge that relates to the case." *Green*, 532 F.3d at 1030; *accord Batson*, 476 U.S. at 97. "Third, if the prosecutor offers a race-neutral explanation, the trial court must decide whether the defendant has proved the prosecutor's motive for the strike

was purposeful racial discrimination." *Green*, 532 F.3d at 1030; *accord Johnson*, 545 U.S. at 168; *Batson*, 476 U.S. at 98.

**[2]** Collins objected when the prosecution struck Juror No. 9, the only remaining African-American member on the panel, and argued that she was struck on account of her race. The district court found that Collins failed to make a prima facie showing of discrimination and did not require the government to explain why it peremptorily removed Juror No. 9. We generally review a district court's *Batson* determination for clear error because of the intrinsically factual nature of the claim. *Tolbert v. Page*, 182 F.3d 677, 681-82 (9th Cir. 1999) (en banc). However, where the district court applies the wrong legal standard, we review the claim de novo. *See Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (concluding that the state court applied the wrong standard by requiring defendant to "show a strong likelihood" of bias). The correct test for a prima facie case of discrimination is whether the defendant has shown that "(1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 127 S. Ct. 2249 (2007). A pattern of striking panel members from a cognizable racial group is probative of discriminatory intent, but a prima facie case does not require a pattern because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *accord United States v. Esparza-Gonzalez*, 422 F.3d 897, 904 (9th Cir. 2005) (holding that prima facie case was shown where prosecutor struck the only Latino prospective juror as well as the only Latino potential alternate juror).

When Collins objected to the government's challenge of Juror No. 9, the district court offered the government the

opportunity to respond but the government declined, stating, "I don't believe sufficient showing has been made." The district court proceeded to rule that no prima facie case had been made. "First [African-American panel member was] excused by defense. First time [the government] has excused any [African-American panel members]. No pattern. No. Overrule without prejudice." Collins protested, "I'm objecting that it can't be a pattern because it's the only one [African-American panel member] left." The court did not address Collins's argument, but said "Okay. With the defense," and voir dire continued."

**[3]** Based on the court's brief statements, we conclude that it applied an improper standard by requiring Collins to demonstrate a pattern of strikes against a cognizable racial group before requiring the government to state a reason. *Vasquez-Lopez*, 22 F.3d at 902. The government's attempts on appeal to interpret the district court's comments in any other way are unconvincing. Moreover, we conclude that the district court did not correct its error when Collins renewed his *Batson* motion after trial. Although the court recited the proper standard at the post-trial hearing, it did not recognize its prior error: it said, "I have no reason to reverse the original ruling." Consequently, we cannot be certain that the district court was not under the impression that a "pattern" of strikes was required. Therefore, we review de novo Collins's equal protection argument.

**[4]** The first two elements of a prima facie case do not appear to be in dispute; Juror No. 9 is a member of a cognizable racial group, and the prosecutor used a peremptory strike to remove her. Rather, the parties' debate concerns whether the allegation gives "rise to an inference" of discrimination, which is a less burdensome standard of proof than the preponderance ("more likely than not") standard. *Johnson*, 545 U.S. at 168. "[T]he burden for making a prima facie case is not an onerous one." *Boyd,* 467 F.3d at 1151. At the prima facie stage of a *Batson* challenge, the burden of proof required of

the defendant is small, especially because proceeding to the second step of the *Batson* test puts only a slight burden on the government. This is because the government never bears the ultimate burden of persuading the district court that it did not act with a discriminatory purpose; that burden persists with the defendant. *Johnson*, 545 U.S. at 170-71. Rather, an easily met burden of proof momentarily shifts, at step two, to the government: to meet its burden, the government need only disclose its (nondiscriminatory) purpose for striking the potential juror. *See id.* at 171 (stating that the government satisfies its burden of proof even if it presents "only a frivolous or utterly nonsensical justification for its strike"). The ultimate burden then returns to the defendant at step three, and the defendant must persuade the district court that the government's (nondiscriminatory) reason is pre-textual. *Id.* A single inference of discrimination based on "all [the] relevant circumstances" and the "totality of relevant facts" is sufficient to move the *Batson* inquiry to step two. *See*, *e.g.*, *Batson*, 476 U.S. at 94, 96.

**[5]** The government relies heavily upon *Vasquez-Lopez*, 22 F.3d at 902, where we said that "the fact that the juror was the one [b]lack member of the venire does not, in itself, raise an inference of discrimination." *See id.* (applying clear error standard of review). This should not be a controversial statement because it is not the prosecutor who chooses the panel members. Therefore, under a *Batson* challenge, we do not hold against the government the fact that the panel lacked African-American members.[1] The lack of diversity in the panel, along with the removal of each African-American, however, does justify close scrutiny of the challenge. *See United States v. Chinchilla*, 874 F.2d 695, 698 n.5 (9th Cir. 1989) ("However, although the striking of one or two members of the same racial group may not always constitute a

---

[1]Collins does not raise a claim that the potential jurors were drawn from a nonrepresentative cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357, 363-64 (1979).

prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury."). Moreover, if we do not look closely at the prosecutor's challenge of the sole African-American, it would be impossible for a defendant in Collins's position to establish a case of prima facie discrimination.

Courts have discussed several situations in which a prima facie case of discrimination may exist. The Supreme Court has said that the existence of a pattern of striking minority panel members is a relevant consideration that may raise an inference of discrimination. *Batson*, 476 U.S. at 96-97. We have found an inference of discrimination where the prosecutor strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group. *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002). Striking members of more than one protected group is also relevant and may indicate a discriminatory intent. *Id.* at 1079-80. A prosecutor's questions and statements to the venire are relevant because they might provide insight into her motive. *Batson*, 476 U.S. at 97. Likewise, the fact that the prosecutor fails to "engage in meaningful questioning of any of the minority jurors" might indicate the presence of discrimination. *Fernandez*, 286 F.3d at 1079.

[6] Despite a wealth of precedent in this area, this is a difficult case because none of the aforementioned considerations apply. Juror No. 9 was the only African-American panel member subject to a strike by the government:[2] The lack of other African-Americans in the jury pool renders mathematical trends and patterns meaningless. The prosecutor may have only used 25% of his four challenges on African-Americans,

---

[2]In total, there were three African-Americans on the venire. The first was struck by the defense, the second was Juror No. 9, and the third, a potential alternate juror, was struck for cause by the district court because he said it was his personal belief that anyone who went to trial was guilty.

but by the same logic, the prosecutor struck 100% of the remaining African-Americans from the jury. Moreover, the district court questioned the panel; therefore, we do not have the benefit of analyzing the prosecutor's questions for discriminatory meaning.

Collins argues that the prosecutor retained white jurors who gave answers similar to those given by Juror No. 9. Comparative juror analysis, a tool for conducting meaningful appellate review of whether a prima facie case has been established, is useful in analyzing such a claim. *See Boyd*, 467 F.3d at 1149-50 (holding that it was error for state appellate court not to review complete voir dire transcript because without such review there could be no comparative juror analysis); *Esparza-Gonzalez*, 422 F.3d at 904 (stating that it is "relevant for the court to consider the differing treatment of similarly situated potential jurors"). Comparative juror analysis involves comparing the characteristics of a struck juror with the characteristics of other potential jurors, particularly those jurors whom the prosecutor did not strike. *See Miller-El v. Dretke*, 545 U.S. 231, 241, 247-48 (2005) (applying comparative juror analysis); *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (en banc). An inference of discrimination may arise when two or more potential jurors share the same relevant attributes but the prosecutor has challenged only the minority juror.

Juror No. 9 provided little information during voir dire. She lived in Compton, California, and was a medical records manager for USC Family Medicine. She did not state whether she was married or had children, but stated that no adult at home worked outside the house. Collins compares Juror No. 9's answers to those of three other jurors who gave similar responses but were retained by the prosecutor: Juror No. 5, a health insurance claims examiner, who lived with her husband and 15 year-old son; Juror No. 6, a bookkeeper for a family-owned real estate business, who lived on the west side of Los Angeles and had prior civil jury experience; and Juror No. 10,

a financial analyst whose husband worked in computer sales and who had an adult daughter living at home. Collins contends that none of these jurors, like Juror No. 9, reported any connections or negative experiences with law enforcement, illegal drugs, or the criminal justice system.

**[7]** In response, the government argues that these jurors are not similarly situated to Juror No. 9 because they were either married with children (Juror No. 5 and Juror No. 6) or had prior civil jury experience (Juror No. 6).[3] The government cites these facts as potential non-racially motivated justifications for a strike. Collins points out, however, that the government accepted another prospective juror, Juror No. 14, who was single and had no prior jury experience. Moreover, the record does not show whether Juror No. 9 actually had a husband or children. The court only asked the jurors to state whether there were "any adults living in the home that are employed outside of the home." While several jurors used this question to identify the working adults as spouses or children, the court posed no question asking if jurors had a spouse or child. Juror No. 9 merely answered the question without giving unsolicited answers. If the prosecutor was interested in marital or parenthood status, he does not appear to have asked the court to inquire specifically about that issue with Juror No. 9. Accordingly, comparative juror analysis does not reveal any meaningful distinctions between Juror No. 9 and other panel members who were retained by the government.

**[8]** Thus, based on our review of the record, we conclude that an inference of discrimination did exist in this case. Comparison of Juror No. 9's characteristics with the characteristics of other similarly situated panel members who were allowed to serve reveals little distinction that could account for the prosecutor's strike of Juror No. 9. In addition, the prosecutor

---

[3]As a threshold matter, we note that there is no requirement that jurors be identically situated in order for meaningful comparison to take place. *See Miller-El*, 545 U.S. at 247 n.6.

did not pursue further questioning before striking the only remaining African-American panel member. *See Esparza-Gonzalez*, 422 F.3d at 905 ("[T]he prosecutor had very little hard information to base this decision on. Although the prosecutor has no obligation to question all potential jurors, his failure to do so [before] removing a juror of a cognizable group . . . may contribute to a suspicion that this juror was removed on the basis of race."). Finally, none of Juror No. 9's answers to the court's questions suggests a reason for her removal: nothing she said indicated a predisposition toward the defendant or a bias against the government.[4] *See Boyd*, 467 F.3d at 1147 ("[N]othing in the struck juror's voir dire responses intimated a legitimate basis for removal."). Although any of these factors standing alone may have been insufficient to establish a prima facie case, the totality of the circumstances raises an inference of impermissible discrimination.

**[9]** Consequently, the district court erred by not advancing to step two of the *Batson* inquiry. We remand, with instructions that the court require the government to provide its reason for striking Juror No. 9. The district court should then determine, in the first instance, whether the strike was discriminatory.

## II.

Collins next argues that the government failed to turn over an audiotape recording of a conversation between confidential informant Kim and Kim's confederate Wenceslao Martinez, an individual not directly related to Collins's case. The recording was finally disclosed, during post-trial proceedings. Collins contends that the recording establishes that informant Kim knew Oscar Torres, another drug dealer of Kim's acquaintance, was looking to "get" Kim. Collins urges us to

---

[4]This is in stark contrast to the government's other peremptory strikes, the reasons for which were readily apparent from the transcript.

reverse his conviction because the suppression of the recording violated his right to due process under the Fourteenth Amendment. *See Brady,* 373 U.S. at 87.

**[10]** We review de novo an alleged *Brady* violation. *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004). "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." *Brady*, 373 U.S. at 87. "Evidence is material and favorable if there is a reasonable probability that the disclosure of the evidence would have changed the trial's result." *Ross*, 372 F.3d at 1107. "A defendant need not show that she would more likely than not have received a different verdict with the evidence." *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (en banc) (internal quotation marks omitted). "Defendants need only show 'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* at 1054 n.7 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). In considering this, "judges must undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Id.* at 1054 (internal quotation marks omitted). "In other words, the withheld evidence must be analyzed in the context of the entire record." *Id.* (internal quotation marks omitted).

Collins gives three reasons why he believes the recording is favorable and material evidence. He contends that the recording (1) impeaches Kim by contradicting statements he made at trial, (2) similarly impeaches Agent Oz, and (3) is substantive proof that Kim had a motive to entrap Collins.[5]

---

[5]"Entrapment has two elements: (1) government inducement to commit the crime; and (2) the absence of predisposition to commit the crime. If the defendant is able to put entrapment in issue, the government bears the burden of negating the defense beyond a reasonable doubt." *Ross*, 372 F.3d at 1108 (citation omitted).

We consider together his two impeachment arguments. First, we observe that this is not a case in which the defense lacked notice of the alleged impeaching facts, such as the existence of the threat to Kim. *Cf. Jernigan*, 492 F.3d at 1054-55. A Drug Enforcement Agency report of the recording was disclosed to Collins and documented the existence of the threat. Moreover, Collins asked Kim and Agent Oz about the threat on cross-examination. The question, then, is whether the recording of the actual conversation where the threat is relayed (as opposed to the fact of the threat) undermines confidence in the verdict.

**[11]** With regard to the impeachment of Kim and Agent Oz, the recording adds little value. Evidence relevant to the impeachment of a witness adverse to the defendant may be favorable and material when "the reliability of the witness may be determinative of the defendant's guilt or innocence." *United States v. Bracy*, 67 F.3d 1421, 1428 (9th Cir. 1995). Kim's reliability was important in refuting Collins's contention that he resisted committing the crimes and was convinced only through Kim's persistence and withholding of other business opportunities upon which they were already involved together. However, there was already substantial evidence introduced at trial of Kim's bias toward the government and his incentive to lie. For example, Kim admitted that he had been arrested for sending five pounds of methamphetamine to Hawaii and that he was cooperating with the government in exchange for several benefits, including release from jail without having to post a bond, cash, sentencing leniency, and immunity for other crimes. Furthermore, Kim's restaurant, the source of his livelihood, was bought with drug money, and Kim admitted that the government had not (at the time of trial) made any inclination toward seizing the property or charging him with money laundering. In addition, the evidence of his bad character was overwhelming: Kim admitted that he smoked marijuana *in jail*, that he had been dealing drugs his entire adult life, that he dealt in quantities of drugs that netted him at least a million dollars in less than two years,

that he was arrested for committing domestic violence, and that he was arrested on another occasion where a handgun and a quarter pound of methamphetamine were seized from his house. Finally, Kim agreed that he was not the "type of person upon whose word someone can rely and count on."

Collins argues that the district court disregarded the value of impeachment by contradiction because Kim testified that he had never heard that another drug dealer (Torres) was making threats against him. Collins argues that the recording would have been evidence that Kim was lying because the recording reveals that Martinez told Kim that Torres was looking to "get him" and that he should stay away from Torres. However, Collins overstates the impeachment value of these statements. When asked about the phone conversation, Kim thrice said only that he did not *remember* learning about such a threat. Only after the fourth time, when asked by the district court, after some confusion, did Kim respond with a more definite "No, sir" to the question "Did anybody named Martinez ever call you up and talk to you about a threat on your life?" This exchange suggests that, even if Collins had the recording with which to impeach Kim, its impeachment value would have been little because on three occasions Kim said only that he did not remember a threat, not that one did not exist.

Moreover, the fact that the threat was admitted into evidence by way of Agent Oz, who had listened to the recording and admitted that Martinez relayed a threat to Kim, undermines the recording's impeachment value as contradicting Kim's trial testimony. Collins points out, however, that Agent Oz improperly characterized Kim's response to that threat when she said, "I believe [Kim's] comment [when told Torres was looking to kill him] was 'I don't think so.'" No such statement appears in the transcript of the recording. This, too, is weak impeachment evidence. Oz's statement was tentative; she said, "I believe his comment was." Furthermore, if we

keep reading Oz's testimony, it is evident that she had a reason to believe that Kim did not take the threat seriously:

> He didn't perceive a threat on his life. If I was to go into more detail about the relationship between those people I think you would understand why he didn't. . . . The reason being . . . [Martinez and Torres] were always in a feud trying to get [Kim's] business because he was a good customer. He bought a lot of dope from both of them. When that conversation was made it was after James Kim was released from jail.

Her explanation is neither supported nor contradicted by the recording, and her explanation that she did not believe Kim took the threat seriously is not undermined by the tape. Consequently, we conclude that the recording has little value as impeachment evidence against either Kim or Oz. Certainly, it does not undermine our confidence in the verdict.

**[12]** Finally, Collins contends the recording is material as proof that Kim actually knew about the threat and took it seriously. As we have explained, however, Agent Oz testified that a threat did exist. Kim admitted that he traded on his friendship with Collins to get Collins to find drugs for him on other occasions. Moreover, the existence of a threat was tangential to the question of whether Kim induced Collins to commit the crimes. In other words, Collins's argument that the threat establishes a motive for Kim to entrap Collins—rather than setup more dangerous drug dealers threatening Kim—is attenuated at best. The audiotape recording, while relevant and favorable, is not material, and its suppression did not infringe Collins's right to due process.

### III.

Collins also argues that the suppression of the tape violated his Sixth Amendment right of confrontation because he was unable to use the suppressed recording to impeach Agent Oz

and Kim. The primary purpose of the right of confrontation is " 'to secure for the opponent the opportunity of cross-examination.' " *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (emphasis omitted) (quoting 5 J. Wigmore, *Evidence* § 1395 (3d ed 1940)). Cross-examination affords an opportunity to demonstrate an adverse witness' potential biases and motivations. *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc), *cert. denied*, 128 S. Ct. 1647 (2008). We have two standards of review for violations of the confrontation clause. De novo review applies when the district court excludes an area of inquiry. *Larson*, 495 F.3d at 1101. But we review for abuse of discretion a district court's limitation on the scope of questioning. *Id.*

**[13]** Collins's argument does not fit neatly within either claim because he is arguing, in effect, that suppression of material by the government, not the district court, violated his right to confront the witnesses against him in a meaningful manner. However, it is not clear that Collins's contention is the law. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) (plurality opinion) (stating that the confrontation clause is not a "constitutionally compelled rule of pretrial discovery"). We need not decide whether *Ritchie* controls this case, however, because we conclude that any violation was harmless beyond a reasonable doubt, for the same reasons we concluded that the recording was not material. *See Larson*, 495 F.3d at 1107-08 (applying harmless error standard to confrontation clause claim). The recording was not so valuable as impeachment evidence that it affected Collins's substantial rights.

IV.

Finally, Collins argues that the district court erred in refusing to order the government to serve a subpoena upon informant Danny Yim, a resident of Hawaii. Yim was not involved in the two August transactions; rather, he was the buyer in an uncharged July methamphetamine deal, involving Collins and Kim. The government resisted disclosing Yim's identity to

Collins because of Yim's status as a confidential informant and because the government was not pursuing charges based on the July transaction.

Collins, however, learned Yim's identity independent of the government shortly before trial. Despite having learned Yim's identity, Collins was unable to serve process upon Yim, as Yim avoided Collins's investigators. The government, however, was still in contact with Yim, and Collins moved for the district court to order the government to produce Yim or to accept service on behalf of Yim. The district court was skeptical of Yim's relevance because Collins was not charged with the July transaction. Collins made an *in camera* proffer of the relevance of Yim's testimony. He expected that Yim would testify that it was Kim who actually handed the drugs from the July transaction to Yim, not Collins; that Kim smoked methamphetamine with Yim; that Kim kept $6,000 of unreported money from the transaction; and that Kim helped Yim complete the drug deal by encouraging him to cash money orders in order to pay for the drugs. Collins contended that this evidence would show how Kim was desperate to entrap Collins in order to satisfy his debt to the government as a cooperating witness. The district court subsequently denied Collins's request, doubting its ability to order the government to serve a subpoena on behalf of the defense and remaining skeptical that Yim's testimony was necessary to Collins's entrapment defense.

In *Ritchie*, the Supreme Court said that "[o]ur cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." 480 U.S. at 56 (citing cases). In *Ritchie*, and in the cases cited therein, the defendant was impeded from admitting favorable evidence because the government or the court took some action to block the defendant's attempts. *See id.* at 56-58 (due process required that trial court review *in camera* confidential

report protected from disclosure by state law to determine if it was material to the defense); *Cool v. United States*, 409 U.S. 100, 102-03 (1972) (per curiam) (trial court violated defendant's Sixth Amendment right to present exculpatory testimony of accomplice-witness when it instructed the jury that they could credit testimony only if they were convinced it was true "beyond a reasonable doubt"); *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (per curiam) (trial court impermissibly singled out convict-witness by implying that it expected the witness to lie and threatening the witness with prosecution for perjury where witness then refused to testify); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (state violated defendant's Sixth Amendment right of compulsory process by prohibiting defendant from admitting the testimony of an accomplice-witness).

**[14]** Accordingly, and more specifically to the point in this case, we have said that, in some cases, the government has a duty to accept service of a subpoena for some confidential informants. *United States v. Gonzalo Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990) (per curiam). "A district court's refusal to order the government to accept a subpoena for a confidential informer produced the same effects as a decision to allow the government to exercise its privilege not to disclose the identity of a confidential informer." *Id.* at 488. We also stated that "[a]llowing the government to refuse to accept a subpoena for an informer is also analogous to allowing the government to deport witnesses whom a defendant may wish to subpoena." *Id.* at 489. In such cases, a "defendant cannot establish a violation of his right to compulsory process unless the defendant can show the testimony would have been 'both material and favorable to the defense.' " *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).

**[15]** The similarity among all of these circumstances is that the government (or the court) is actively restraining or impeding the defendant from using a witness at trial. By contrast, Collins knew Yim's identity prior to trial; the government

was not actively keeping Yim from testifying, either by preventing him from being served or by withholding his identity from the defense. Rather, Yim was resisting service of process. Collins argues that if the government had not resisted disclosing Yim's identity, then he would have had more time in which to serve Yim. But, as Collins admits in his reply brief, he learned Yim's identity before the district court had an opportunity to rule on the motion to compel disclosure. Consequently, we conclude that it was not the government's fault that Yim did not testify and that there is no constitutional right that requires the government to accept service of subpoena for Yim. To hold in Collins's favor would create a rule that the government must accept a subpoena on behalf of any previously confidential informant that the defendant has been unable to serve through no fault of the government. The district court did not err.

V.

The judgment of the district court is AFFIRMED in part and REVERSED and REMANDED in part for the district court to conduct proceedings consistent with our opinion.

---

GRABER, Circuit Judge, concurring:

I concur fully in the opinion. I write separately only to encourage prosecutors to state their reasons for peremptory strikes at the time of a *Batson* challenge.

As the opinion correctly holds, of course, if no prima facie case of discrimination has been made, a prosecutor is not required to give any explanation. The right to challenge a juror *without* cause is one that any litigant understandably wishes to guard. On the other hand, the burden of explaining the reasons for a challenge—in the alternative to arguing that no explanation is required—is minimal. Judicial economy

would be well served. *See, e.g.*, *Paulino v. Harrison*, No. 07-55429, slip op. at 12179 (9th Cir. Sept. 4, 2008) (in a second appeal, upholding habeas relief in a *Batson* case when the prosecutor could not remember her reasons for exercising peremptory challenges at an evidentiary hearing held eight years after the trial). So would confidence in the fairness of a trial because, in fact, prosecutors usually have good and permissible reasons for their challenges; refusing to state them can create unnecessary suspicion, as well as unnecessary litigation.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

While I concur in Parts II, III, and IV of the court's opinion, I cannot concur in Part I's holding that there was a prima facie case of discrimination. Because I believe the panel majority applies the wrong standard of review and therefore reaches the wrong conclusion under *Batson v. Kentucky*, 476 U.S. 79 (1986), I respectfully dissent from Part I of the court's opinion.

I

*Batson* created a three-part burden shifting test which we must apply to ascertain if a juror was stricken for discriminatory reasons. *See id.* at 96-98. Generally, we review a district court's determinations at stage one of this test—whether a defendant has established a prima facie case of discrimination—for clear error. *See Tolbert v. Page*, 182 F.3d 677, 681-85 (9th Cir. 1999) (en banc). The panel majority, however, adopts a de novo standard of review, asserting that the district court applied the improper legal standard. *See* Maj. Op. at 72-73 (citing *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)).

I am not so persuaded. Clear error review is appropriate here. Collins' attorney objected to the government's peremptory challenge of the remaining African-American juror, Juror No. 9, in open court.[1] The district court overruled the objection. According to the panel majority, the district court's response suggests it believed a "pattern" of discrimination had to be shown. *See* Maj. Op. at 72-73. The majority rightly notes that under our precedent, such a showing is not required (and indeed would be impossible in situations where there is only one African-American juror on the panel). *See United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). Rather, the Supreme Court has held that when assessing a stage-one *Batson* claim, the district court must determine whether the defendant has produced "evidence sufficient to permit the trial judge to draw an *inference* that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005) (emphasis added).

While the district court's initial statement was perhaps inartfully worded, the court later clarified its language when responding to defendant's motion for a new trial. The majority is correct to this extent: when rejecting Collins' argument that he had established a prima facie *Batson* claim, the district court stated that it had "no reason to reverse the original ruling." Maj. Op. at 73. But Judge Klausner—unlike the majority—did not stop there. The district court went on to say that "[t]here is no indication . . . that any of the facts or relevant circumstances have raised any inference that the challenge was racially motivated." The point was reiterated: "There is nothing in this case that [suggests] any inference that the challenge was racially motivated." Thus, regardless of what the statement at trial might suggest, the district court clearly indicated that the "inference of discrimination" standard enshrined in *Johnson* was applied. At the very least, any

---

[1]Collins' attorney had previously struck an African-American member of the venire. The district court, with the concurrence of both parties, also excused an African-American prospective alternate juror for cause.

potential legal error was cured.[2] Accordingly, we should review the district court's findings for clear error.

## II

The panel majority correctly notes that only the third element of a prima facie case of discrimination is at issue: namely, does "the totality of the circumstances raise[ ] an inference that the strike was motivated by race." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006). The fact that the juror stricken was "the one [b]lack member of the venire does not, in itself, raise an inference of discrimination,"[3] as the majority also appropriately emphasizes. *Vasquez-Lopez*, 22 F.3d at 902 ("[I]t is not per se unconstitutional, without more, to strike one or more [b]lacks from the jury." (citing *Batson*, 476 U.S. at 101)); *see also* Maj. Op. at 74. Thus, to determine whether an "inference" of racial discrimination exists, the panel majority has only the nebulous "totality of the relevant facts" and circumstances to assess. *Batson*, 476 U.S. at 94; *Boyd*, 467 F.3d at 1146. After such assessment, including the use of comparative juror analysis,[4] the panel majority con-

[2]At oral argument and in his reply brief, Collins asserts that the district court's statement in response to the motion for a new trial should be considered a "post-hoc" justification, "entitled to little weight." Collins cites *United States v. Mannino*, 212 F.3d 835, 846 (3d Cir. 2000), in support of this claim. However, *Mannino* is inapposite, because in that case, the district court was hypothesizing about how it would have ruled in an alternative scenario. In this case, the district court was not hypothesizing, but rather specifically stating the grounds for its decision.

[3]While the statement is true, of course, it is again worth noting that Juror No. 9 was not the only African-American member of the venire in this case.

[4]As the panel majority states, comparative juror analysis is a tool by which a court seeks out inferences of discrimination through a side-by-side comparison of the stricken juror and other potential jurors who were allowed to serve. *See Boyd*, 467 F.3d at 1147-48; *Kesser v. Cambra*, 465 F.3d 351, 362 (9th Cir. 2006); *see also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . .").

cludes that the prosecutor's actions "raise[ ] an inference of impermissible discrimination." Maj. Op. at 78.

I disagree. Considering the totality of circumstances, it is significant that Collins' attorney struck the first African-American juror (Juror No. 2). Indeed, the prosecution had the opportunity to strike Juror No. 2 before Collins' attorney did and declined to do so. While a pattern is not necessary for a finding of discrimination, the record nonetheless undermines any inference of discrimination. For similar reasons, it is relevant that Juror No. 9 was struck on the government's third peremptory strike. *Cf. United States v. Chinchilla*, 874 F.2d 695, 698 (finding an inference of discrimination where the government used its first peremptory strike against a minority juror).

Using comparative juror analysis, the panel majority and Collins claim that Juror No. 9 was situated similarly to Juror Nos. 5, 6, and 10.[5] They assert that because the government struck Juror No. 9 but permitted the latter group to remain on the jury, a prima facie case of discrimination exists. However, an analysis of the voir dire transcript suggests entirely innocuous reasons for the government to dismiss Juror No. 9, but keep Nos. 5, 6, and 10.

According to the transcript, Juror No. 9 was a female with no relationship to anyone in law enforcement, no negative experiences with law enforcement, and no prior jury experience. Her familial status was unclear, but she stated that she did not live with any working adults. Juror Nos. 5, 6, and 10 are similar in some respects, but there are significant differences. Most notably, Juror No. 6 had prior civil jury experience,[6]

---

[5]Collins also argues in his briefs that Juror No. 3 was similarly situated. However, unlike Juror No. 9, Juror No. 3 was dating a police officer and had previously served on a criminal jury.

[6]The panel majority and Collins argue that "prior jury experience" is not a sufficient basis upon which to distinguish Jurors No. 6 and No. 9

while Juror No. 5 and Juror No. 10 both indicated that they lived with another adult who worked outside the home. In fact, both Juror No. 5 and Juror No. 10 stated that they were married with children.

Reasonable minds could differ as to the impact such disparities could have on a juror's service. However, there is no doubt that as the government asserts, these are "race-neutral, non-trivial" distinctions which cut against Collins' claims that similarly situated jurors were treated differently. Given the deferential standard under which we review such determinations, *see Tolbert*, 182 F.3d at 681-85, on these facts, I cannot conclude that the district court committed clear error in ruling that no prima facie *Batson* claim was established.

### III

Because the majority employs the wrong standard of review and accordingly reaches what I believe to be an erroneous conclusion, I am unable to join the court's decision to remand for further proceedings on the *Batson* claim. I respectfully dissent.

---

because the prosecutor accepted another juror (Juror No. 14) who, like Juror No. 9, had not previously served on a jury. At a minimum, the two are not similarly situated because Juror No. 14 indicated that he lived with people who worked outside the home, said he had a relative whose partner worked in law enforcement, and stated that he could identify certain tattoos which "indicate to [him] . . . things that [potential witnesses] have done."