Filed 1/31/14  P. v. Martinez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MARIO MENDOZA MARTINEZ, et al.,<br><br>　　　　Defendants and Appellants. | Consolidated Case Nos.<br>F063992 & F063998<br><br>(Super. Ct. No. BF137549A)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on January 22, 2014, be modified as follows:

On page 24, following the name of Hoff, J., insert an asterisk designating a footnote and a footnote which reads "*Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution."

The modification does not change the judgment.

_____
Gomes, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Hoff, J.*

---

*Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARIO MENDOZA MARTINEZ, et al.,<br><br>    Defendants and Appellants. | Consolidated Case Nos.<br>F063992 & F063998<br><br>(Super. Ct. No. BF137549A)<br><br>**OPINION** |

-ooOoo-

APPEAL from judgments of the Superior Court of Kern County.  John W. Lua, Judge.

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant Mario Mendoza Martinez.

Richard Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant Fernando Ortiz.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Eric L. Christoffersen, for Plaintiff and Respondent.

-ooOoo-

Appellants Mario Martinez and Fernando Ortiz made a poor choice when they selected their victim in this case. J.H. probably looked like an easy target; a 13-year-old boy riding alone on a scooter in the early evening. Martinez and Ortiz, then ages 20 and 21 respectively, attacked him in the parking lot of a sporting goods store.

J.H. fought back. The men succeeded in robbing the boy of his scooter, but Ortiz had to be taken to the hospital and received five staples to close a serious head wound. J.H. emerged from the incident relatively unscathed.

A jury convicted Martinez and Ortiz of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c))[1] and assault with force likely to produce great bodily injury (§ 245, subd. (a)(1)). Ortiz, who was determined to be the primary instigator, was sentenced to five years in prison. Martinez received a shorter prison sentence of three years. We have consolidated their separately filed appeals.

The first of several issues raised by appellants is a *Wheeler*/*Batson*[2] claim. Although the victim was Caucasian, and both Martinez and Ortiz are Hispanic, defense counsel objected to the prosecutor's use of a peremptory challenge to excuse one of the only African-American members of the prospective jury pool. Having reviewed the transcript of the voir dire proceedings, we agree with the trial court's ruling that the burden of establishing a prima facie case of group bias/discrimination was not satisfied.

A separate challenge is made to the sufficiency of the evidence in support of the convictions for assault with force likely to result in great bodily injury. This claim rests upon the disparity between the injuries sustained by Ortiz and J.H. Such circumstances, however, do not warrant reversal. The elements of section 245, subdivision (a)(1), are not negated simply because Ortiz found himself on the losing end of a fight he started.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

Additional grounds for appeal are alleged on the basis of instructional error, ineffective assistance of counsel, and the trial court's failure to apply section 654 at the time of sentencing. We reject each of these contentions. Accordingly, the judgments are affirmed.

## FACTUAL AND PROCEDCURAL BACKGROUND

J.H. was riding a scooter in the parking lot of a sporting goods store in Bakersfield when he encountered two men whom he had never met. Martinez and Ortiz approached him and said, "Hey, do you want to get jacked?" As J.H. tried to move away, Ortiz struck him on his left side. J.H. responded by swinging his metal scooter at Ortiz, connecting with the side of his head. A scuffle ensued between all three individuals.

J.H. was knocked down at least once. The men eventually pulled the scooter out of his hands and used it to hit him as the fighting continued. The incident ended when a vehicle pulled up to assist Martinez and Ortiz. Retaining possession of J.H.'s scooter, Martinez and Ortiz entered the vehicle and drove away.

Part of the incident was captured on video by a surveillance camera and witnessed by employees of the sporting goods store. The store manager called 911 and was able to provide the license plate of the vehicle in which the assailants had fled. J.H. also called 911 from his cell phone to report what had happened. Police arrested Martinez and Ortiz later that evening and recovered the stolen scooter.

Martinez and Ortiz were charged by criminal information with second degree robbery (Count 1) and assault with force likely to produce great bodily injury (Count 2). At the jury trial held in October 2011, the prosecution's witnesses included J.H., two employees from the sporting goods store, and three officers from the Bakersfield Police Department. The video surveillance footage and audio recordings of the 911 calls were also admitted into evidence. The defense called no witnesses, but argued Ortiz was the true victim and Martinez simply came to his aid. It was further argued that the men did

not intend to rob J.H., but were instead trying to disarm him to prevent further injuries to themselves.

The jury returned guilty verdicts against both defendants. Martinez was sentenced to three years in prison under Court 1 and a concurrent term of two years under Count 2. Ortiz was sentenced to five years in prison under Court 1 and a concurrent term of four years under Count 2.

## DISCUSSION

### *Wheeler/Batson* **Motion**

Jury Selection

Jury selection began with 18 prospective jurors in the jury box. This group was comprised of men and women from at least three or four different ethnic and racial backgrounds. As relevant to the appeal, a woman identified as Juror No. 2 was described by the presiding judge and the trial attorneys as being black or African-American.

Voir dire of the prospective jurors was conducted by the trial court with supplemental questioning from defense counsel and the prosecution, in that order. During the initial round of challenges, the prosecutor exercised his second peremptory challenge to excuse Juror No. 2. Defense counsel objected to the juror's dismissal. The parties agree that the relevant exchange between the presiding judge and trial counsel on this issue was as follows:

> "MR. CARTER [attorney for Ortiz]: Yes. I would like to – I guess this would be the appropriate time to bring a *Batson-Wheeler* motion for the dismissal of Juror No. 2, I believe she was. As far as I can tell – I don't know if she is the only black panel member, or I think there might be one other one out there. It is hard for me to tell. But I bring that motion at this point.

> "MR. NKWONTA [attorney for Martinez]: If I may join, I would invite [the prosecutor] to articulate a specific reason why she was excused based on her answers because from my memory, she was answering every question telling us that she would be a fair and impartial juror. So what is the real basis for her being excused?

4.

"THE COURT: First off, Counsel, insofar as a *Batson-Wheeler* motion is concerned, can you articulate for the record any pattern of conduct posed by the prosecutor to show that he is arbitrarily discriminating against a particular class, racial ethnicity, or gender?

"MR. CARTER: Yes. I mean, it is a little difficult given the panel that we are presented. I only – I can only say at this point that he has picked off 100 percent of the black panel members. I can also say in answer to the questions given were not significantly – raise no significant issues for cause; they raise no significant issues of bias; they raised no issues that would, as far as I could tell, separate her from any of the other panel members who are still presently on the panel. [¶] Part of the problem, of course, is this is very early on; so a pattern – we've only, I think, had three peremptories altogether. So a pattern is going to be hard to determine. But given that we don't have – as I said, my recollection of what I can see from the entire panel present of – I think there was 80 people that were here – it appears to me there was only, maybe, as far as I could tell, one other black person or person of color on the panel. I don't know how much of a pattern you could even get with two people, but she was the only black person on the panel without obvious reasons for dismissal; and, therefore, I bring a motion.

"THE COURT: At this time I am going to deny your motion in that it does not appear to the Court that a prima facie case has been satisfied for the following reasons: [¶] On the one hand, Mr. Carter, you are absolutely correct. If there is racial discrimination or excusing of prospective jurors based on race alone, that would support a prima facie case, so long as it's eliminating either the entire prospective juror population or at least a majority of that prospective juror population. I do not know at this point when looking at the audience whether there are other African-Americans or other persons of similar racial ethnicity to Prospective Juror No. 2, who was, I think, the third peremptory challenge used overall – was used to excuse her. [¶] I am going to deny your motion at this time without prejudice subject to, I guess, laying the proper foundation for that motion upon reviewing the panel in its entirety.

"MR. CARTER: I understand, Your Honor. I understand. But I just have – it seems to me, just maybe to help clarify my thinking, you just stated the prima facie case in that the only black person up there – and perhaps [in] the whole [pool] was just dismissed.

"THE COURT: I don't know. All I know is there was one black person, or African-American, in Seats 1 through 18. I do not know if there are others in the audience that are part of this jury panel.

"MR. CARTER: All right.

5.

"THE COURT:  Anything further counsel?

"MR. CARTER:  "No."

Counsel for Martinez renewed his motion after the jury had been selected, which prompted an additional discussion:

"MR. CARTER:  I will renew my *Batson-Wheeler* motion given there was, at best, one other person of color in the audience.

"THE COURT:  All right.

"MR. NKWONTA:  I join.

"THE COURT:  Counsel, as I stated previously, it does not appear to the Court a prima facie case has been shown in which to grant that in that the Court does recall the previous statements offered by the attorneys.  [¶] Mr. Cuper, any comment or response you would like to make on the record at this time regarding excusing at that time Prospective Juror No. 2, Ms. [S]?

"MR. CUPER [the prosecutor]: No, thank you, Your Honor.

"THE COURT:  All right.  The record should reflect that as previously represented, the attorneys – I mean, the defendants in this case are of Hispanic origin; that [Juror No. 2] appeared to be African-American and, at least within Seats 1 through 18, was the only African-American on the panel.  [¶] It did not appear to the Court that there was any discrimination to a particular class of subjects insofar as exercising peremptory challenges to discriminate or to eliminate one racial origin over another.  For those reasons, as well as the answers given by Prospective Juror No. 2 at the time, as well as questions asked of the panel in whole, that a prima facie case has not been shown."

Analysis

A *Wheeler/Batson* motion refers to the rule derived from its namesake cases that peremptory challenges based on a prospective juror's race or membership in a similar cognizable class are prohibited under the state and federal Constitutions.  (*People v. Avila* (2006) 38 Cal.4th 491, 541.)  African-Americans and African-American women are cognizable groups in this context.  (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*).) Although Martinez and Ortiz are Hispanic, case law holds that a defendant need not be of

6.

the same race as a prospective juror to object to an unlawful peremptory challenge by the prosecutor. (*People v. Burgener* (2003) 29 Cal.4th 833, 863, citing *Powers v. Ohio* (1991) 499 U.S. 400, 415-416.)

"There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).) To rebut this presumption, the party making a *Wheeler/Batson* motion must successfully complete a three-step procedure. (*Ibid.*) "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. and citations omitted.)

The trial court in this case found the first step was not satisfied, i.e., that the moving parties failed to establish a prima facie case of group discrimination. The applicable standard of review requires us to consider the jury selection proceedings as a whole to determine whether substantial evidence supports the ruling. (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994; *People v. Howard* (1992) 1 Cal.4th 1132, 1155.) The focus of the prima facie inquiry is on the moving party's contentions and the record of voir dire. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 781.) "Because of the trial judge's knowledge of local conditions and local prosecutors, powers of observation, understanding of trial techniques, and judicial experience, we must give 'considerable deference' to the determination that appellant[s] failed to establish a prima facie case of improper exclusion." (*Id.* at p. 782; cf., *Uttecht v. Brown* (2007) 551 U.S. 1, 9 ["Deference to the trial court is appropriate because it is in a position to assess the

7.

demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."].)

Contrary to the arguments of Martinez and Ortiz, a prima facie case did not arise simply because the prosecutor dismissed the only African-American person on the prospective jury panel (or possibly one of only two "persons of color" in the entire pool). It is true that even a single race-based challenge is prohibited. (*People v. Cleveland* (2004) 32 Cal.4th 704, 734.) However, a reasonable inference of discrimination requires more than the excused juror's membership in a cognizable group that is underrepresented in the jury pool. In the recent case of *People v. Harris* (2013) 57 Cal.4th 804 (*Harris*), where a prosecutor dismissed the only two black women who had been called to the jury box, it was held that "the small number of African-Americans in the jury pool makes 'drawing an inference of discrimination from this fact alone impossible.'" (*Id*. at p. 835.)

Other cases have rejected appellants' proposition in the face of more questionable ratios than those presented here. In *People v. Streeter* (2012) 54 Cal.4th 205, 223, the prosecutor's use of three out of five peremptory challenges against African-Americans did not establish a prima facie case. The same was true in *People v. Clark* (2011) 52 Cal.4th 856, 905, where the prosecutor challenged four out of five African-American prospective jurors. Another example is *Bell*, *supra*, which involved the use of peremptory challenges to exclude two of three African-American jurors. (*Bell*, *supra*, 40 Cal.4th at pp. 597-598.)

While the dismissal of some or all members of a cognizable group is relevant to the *Wheeler/Batson* analysis, other probative circumstances must exist. Commonly considered factors include the nature of the questioning by the prosecutor, the racial or ethnic background of the defendant and the victim, and the similarity of challenged jurors based on characteristics other than group membership. (*Harris*, *supra*, 57 Cal.4th at pp. 834-835.) With regard to the first consideration, evidence that the prosecutor engaged in

8.

"desultory voir dire" or no questioning at all may suggest a discriminatory motive. (*Id*. at p. 835.)

None of these factors supports the existence of a prima facie case in this matter. Appellate counsel for Ortiz initially claimed the prosecutor failed to question Juror No. 2, but admitted the mistake in his reply brief. The prosecutor asked questions of eight individuals in the jury box, one of whom was Juror No. 2. The prosecutor challenged one of those eight people for cause (Juror No. 11) and exercised peremptory challenges against two others (Juror No. 2 and Juror No. 12). The prosecutor's voir dire was brief, but understandably so considering he went last after three rounds of questioning by the trial court and two defense attorneys. (See *People v. Christopher* (1991) 1 Cal.App.4th 666, 672 ["Although the prosecutor challenged the sole African-American prospective juror, his questioning of that juror, while short, was not perfunctory nor unusually limited when compared with his questioning of other members of the panel."].)

The characteristics of the excused jurors disclose no suspicious patterns. Juror No. 11, who was Hispanic (as were several other members of the pool), was challenged for cause after expressing distrust of police officers based on a personal experience of racial profiling. Juror No. 12 differed from Juror No. 2 in age, race, occupation, and residence (they lived on opposite ends of the county). Moreover, the lack of any racial commonality between Juror No. 2, the victim, and the defendants, reasonably weighs against the existence of a prima facie case.

The only other grounds offered in support of the *Wheeler/Batson* motion was the opinion of Ortiz's defense counsel that the voir dire responses of Juror No. 2 "raise[d] no significant issues for cause[,] no significant issues of bias [and] no issues that would, as far as I could tell, separate her from any of the other panel members." Martinez's trial counsel focused exclusively on the prospective juror's stated ability to be fair and impartial. Both lawyers ignored a basic tenet of the peremptory challenge procedure.

9.

Prosecutors and defense attorneys alike have the right to excuse a prospective juror "based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact." (*Id*. at p. 622.)

It is hardly a remarkable occurrence for a prospective juror to be peremptorily challenged despite their promise to remain fair and impartial. Express representations to the contrary would subject the juror to dismissal for cause. In *People v. Cornwell*, 37 Cal.4th 50 (*Cornwell*), a defendant's *Wheeler/Batson* motion "alluded to nothing more than the circumstance that (1) one of the two African-Americans among the potential jurors had been challenged, and (2) the juror would not have been subject to excusal for cause." (*Id*. at p. 69.) Our Supreme Court made the following observation before concluding the defendant had failed to establish a prima facie case: "The circumstance that the juror was not subject to exclusion for cause certainly did not support an inference that the exercise of a peremptory challenge against her was motivated by group bias." (*Cornwell*, *supra*, 37 Cal.4th at p. 70.)

Furthermore, a defense attorney's favorable opinion of the excused juror's voir dire responses carries little weight, if any, in our analysis of the overall circumstances. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 76.) One could easily argue that defense counsels' objection to the dismissal of Juror No. 2 evidenced their preference for her to remain on the jury for some unspoken reason – perhaps the same reason which motivated the prosecutor to exercise his peremptory challenge. Nevertheless, Martinez and Ortiz insist we must engage in what is known as a "comparative juror analysis" to glean insight into the prosecutor's thought process. They are wrong.

"The rationale for comparative juror analysis is that a side-by-side comparison [of the characteristics and voir dire responses] of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination …." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109.) However, the courts of this state have repeatedly held that such an undertaking is only required at the third stage of the *Wheeler/Batson* analysis. (See, e.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1019-1020.) The California Supreme Court reiterated its position during the pendency of this appeal: "When a trial court has found no prima facie showing, and the prosecutor has declined to state reasons for the excusals, we have declined to conduct a comparative juror analysis." (*Harris*, *supra*, 57 Cal.4th at p. 836.)

Appellants rely on *U.S. v. Collins* (9th Cir. 2009) 551 F.3d 914 (*Collins*), wherein the Ninth Circuit described comparative juror analysis as "a tool for conducting meaningful appellate review of whether a prima facie case has been established …." (*Id.* at p. 921.) Our Supreme Court has acknowledged the *Collins* opinion and does not subscribe to the same view. (*Harris*, *supra*, 57 Cal.4th at p. 836.) The reason is simple: employing such a procedure on appeal to the first step of the *Wheeler/Batson* inquiry is the equivalent of a guessing game.

Even at the third stage, comparative juror analysis has inherent limitations. "A transcript will show that the panelists gave similar answers; it cannot convey the different ways in which those answers were given." (*Lenix*, *supra*, 44 Cal.4th at p. 623.) "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Id.* at p. 624.)

There are further limitations when appellate review focuses on the prima facie grounds for the motion. "Where, as here, no reasons for the prosecutor's challenges were

accepted or posited by either the trial court or this court, there is no fit subject for comparison." (*Bell*, *supra*, 40 Cal.4th at p. 601.) "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales …." (*Bonilla*, *supra*, 41 Cal.4th at p. 350.)

Appellants' reliance upon *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Miller-El*) is misplaced. "*Miller-El* arose at the third stage of a *Wheeler-Batson* inquiry, [which occurs] 'after the trial court has found a prima facie showing of group bias, the burden has shifted to the prosecution, and the prosecutor has stated his or her reasons for the challenges in question.' The high court did not consider whether appellate comparative juror analysis is required 'when the objector has failed to make a prima facie showing of discrimination.' A fortiori, *Miller-El* does not mandate comparative juror analysis in a first-stage *Wheeler-Batson* case when neither the trial court nor the reviewing courts have been presented with the prosecutor's reasons or have hypothesized any possible reasons." (*Bell*, *supra*, 40 Cal.4th at p. 601, citations omitted.)

As stated above, a presumption exists that the prosecution has exercised its peremptory challenges in a constitutional manner. Martinez and Ortiz do not rebut this presumption. Their *Wheeler/Batson* motion was based on a challenge against one of possibly two African-American members of the jury pool and their attorneys' opinion that there was no apparent reason for the prospective juror's dismissal. Such a skeletal assertion, without more, does not establish a prima facie case of discrimination.

In considering the totality of the circumstances, we note the peremptory challenge came in the early stages of the selection process at a time when there was a racially diverse group in the jury box. According to defense counsel, at least one other African-American person remained in the pool. It is also significant that neither appellants nor their victim were of the same race as the excused juror. These facts, combined with the

12.

absence of countervailing circumstances, constitute substantial evidence in support of the trial court's finding that a prima facie case of racial discrimination was not made.

**Sufficiency of the Evidence**

Martinez and Ortiz each challenge the sufficiency of the evidence in support of their convictions for assault by force likely to produce great bodily injury within the meaning of section 245, subdivision (a)(1). To assess their arguments, we review the entire record to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict – i.e., evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant[s] guilty beyond a reasonable doubt. In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*, citations omitted.)

Criminal assault requires an attempt to inflict violent injury and the present ability to do so. (§ 240.) For purposes of section 245, "great bodily injury" means significant or substantial injury. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7 (*Brown*).) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028, original italics.) If harm does occur, the nature of the victim's injuries is a relevant fact to consider in determining whether the force used was capable of producing, and likely to produce, great bodily injury. (*Brown*, *supra*, 210 Cal.App.4th at p. 7.)

At trial, defense counsel repeatedly reminded the jury that Ortiz was seriously injured from being struck with J.H.'s scooter. Whatever strategy was behind this tactic, it cuts directly against the arguments advanced on appeal. The testimony of J.H., along

13.

with the video surveillance footage, was more than sufficient to establish that the same scooter was used to hit J.H. on the head after appellants had wrested it from his hands. In addition to scrapes and bruises on his body, J.H. sustained cuts on his scalp. The severity of the head injuries sustained by Ortiz from the same "weapon" (as it was described by defense counsel) supports a reasonable inference that the force used against J.H. carried the same likelihood of significant or substantial harm.

The video evidence and testimony from multiple eyewitnesses also supports the conclusion that Martinez and Ortiz were both involved in the assault. Respondent aptly notes that Martinez and Ortiz are subject to the doctrine of aider and abettor liability. (§ 31.) Therefore, it does not matter which man actually swung the scooter at J.H. The evidence in the record substantially supports the convictions of both appellants.

**Ineffective Assistance of Counsel**

Ortiz asserts a claim for ineffective assistance of counsel based on his trial attorney's disclosure of certain information during opening statements. The remarks were made in the context of explaining why appellants were at the sporting goods store at the time of the incident. Counsel's narrative was as follows: "[Ortiz was] hanging around with his friends. They decide – it's his grandfather's birthday. They decide to go buy – Mr. Ortiz decides to go buy his grandfather a little present. And in this case it was just a little – some bullets, .40 caliber bullets so he could shoot. Okay? They are going into the store to buy a present. They go into the store, make their purchase. They come out of the store. You've heard a little description of that…."

Ortiz believes his attorney "poisoned the minds of the jurors by deliberately and unnecessarily informing the jury that [he] had purchased high power .40 caliber bullets as a birthday present for his grandfather." Martinez joins in the claim under the theory that his own counsel should have moved for a mistrial because the prejudicial effect of the information was equally applicable to him. Both positions are untenable.

14.

An appellant must establish two things to show ineffective assistance of counsel: (1) the performance of his or her counsel fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86-87.) These elements are often difficult to prove. "In evaluating defendant's showing [a court accords] great deference to the tactical decisions of trial counsel in order to avoid second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel to defend himself or herself against a claim of ineffective assistance after trial rather than to defend his or her client against criminal charges at trial." (*In re Avena* (1996) 12 Cal.4th 694, 722, citations and internal quotation marks omitted.)

In accordance with the deferential standard of review, we presume the actions of defense counsel "might be considered sound trial strategy" under the circumstances of the case. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 (*Mesa*), quoting *Strickland*, *supra*, 466 U.S. at p. 689.) Therefore, "a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission." (*Mesa*, *supra*, 144 Cal.App.4th at p. 1007.) Here, it is fairly obvious Ortiz's attorney was trying to humanize his client after the prosecutor had portrayed him as a bully who randomly attacked a much younger and smaller child for no apparent reason. The explanation also served to emphasize Martinez and Ortiz had a specific purpose for being at the store and were not simply roaming the streets in search of a victim.

Appellants argue these goals could have been accomplished without reference to the .40 caliber ammunition. However, as suggested by respondent, the rationale may have been that by identifying the item, the jury was more likely to believe Ortiz had

sufficient funds such that he had no reason to steal J.H.'s inexpensive scooter.[3] Respondent also notes counsel later elicited testimony from one of the store employees that Ortiz had money to pay for the item.

Under the circumstances, we are not convinced there could not have been a rational tactical purpose for counsel's statements.  Regardless, even if appellants could clear the first *Strickland* hurdle, their claim would fail under the second test.  "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different."  (*Mesa*, *supra*, 144 Cal.App.4th at p. 1008.) Although the error alleged by Martinez is his attorney's failure to move for a mistrial, his claim stands or falls with the viability of Ortiz's arguments since a mistrial is warranted "only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 282, citations and quotation marks omitted.)

To say the reference to Ortiz's purchase of ammunition was fatally prejudicial to his case is a highly speculative and subjective argument.  No guns were involved in the incident and the ammunition was said to have been purchased for a relative.  If there was a gun owner on the jury panel, the information may have had a positive impact.  In any event, proof of reversible error "'must be a demonstrable reality and not a speculative matter.'"  (*People v. Karis* (1988) 46 Cal.3d 612, 656.)  In light of the overwhelming evidence in support of appellants' guilt, it is not reasonably probable that, but for counsel's alleged error, a more favorable verdict would have been rendered.

**Alleged Instructional Error on Mutual Combat**

Background

Appellants each relied on a claim of self-defense to justify their actions against J.H.  Although he did not testify at trial, Martinez told police at the time of his arrest that

---

[3] J.H. claimed he bought the scooter for nine dollars.

the incident began when "a white guy hit [my] homey." Both defense attorneys argued J.H. was the initial aggressor and/or used unreasonable force against Ortiz. Martinez was described as a "Good Samaritan" who saved Ortiz's life. Pursuant to these theories, counsel argued the defendants had a right to defend themselves and each other.

The trial court instructed the jury on self-defense using CALCRIM Nos. 3470, 3471, 3472, and 3474. We are concerned here with CALCRIM No. 3471, a version of which was given as follows:

> "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if:
>
> "1. He actually and in good faith tries to stop fighting;
>
> "AND
>
> "2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting.
>
> "If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight.
>
> "If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."

Martinez and Ortiz present a twofold argument with respect to the term "mutual combat" as used in the first sentence of the instruction. First, appellants allege the trial court erred by failing to delete this term because none of the parties advanced a theory of mutual combat during trial. Second, they contend the error was exacerbated by the

17.

court's omission of a bracketed portion of the instruction which provides the legal definition of "mutual combat."[4]

Because mutual combat has a specific legal meaning, Martinez and Ortiz believe the erroneous inclusion of the term without an accompanying definition confused the jury. More specifically, appellants hypothesize that the jurors interpreted the instruction to mean that the act of exchanging blows with J.H., regardless of the circumstances, "disqualified the participants from claiming self-defense, even if the jury determined [that neither of them were] the initial aggressor."

Analysis

As a preliminary matter, we decline to address the parties' debate over whether this issue was waived or forfeited. It appears from the record that the trial court held an unreported jury instruction conference with the trial attorneys, the details of which are unknown to us. In any event, appellants alternatively claim ineffective assistance of counsel on grounds that their lawyers allowed the alleged instructional error to occur. The latter contention inevitably requires a substantive analysis. As we will explain, there is no basis for reversal under any theory.

It is evident from the first sentence of the instruction that CALCRIM No. 3471 applies to a person who engages in mutual combat *or is the initial aggressor*. Appellants' heavy reliance on *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*) overlooks the fact that CALCRIM No. 3471 was not at issue in that case. *Ross* involved juror confusion over a version of CALJIC NO. 5.56, which is an instruction devoted exclusively to self-defense in a mutual combat scenario and does not include the disjunctive language of CALCRIM No. 3471. (*Ross*, *supra*, 155 Cal.App.4th at p. 1042, fn. 9.) The instruction

---

**4** "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (CALCRIM No. 3471.)

18.

in *Ross* was given erroneously, without any evidence that would have made it applicable, and the jury sought clarification during deliberations.  (*Id.* at pp. 1042, 1049-1052.)  Not only is *Ross* inapposite to the facts of this case, it also does not stand for the proposition that failure to define "mutual combat" when using CALCRIM No. 3471 constitutes reversible error.

We agree the evidence adduced at trial does not support a reasonable inference that the parties engaged in mutual combat.  We do not agree, however, that inclusion of those two words in the challenged instruction sent the jury into a mental tailspin.  Jurors are presumed to be intelligent persons "'capable of understanding and correlating all jury instructions which are given.'"  (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)  "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'"  (*Id.* at p. 1112, quoting *People v. Laskiewicz* (1986) 176 Cal. App. 3d 1254, 1258.)

"[G]iving an irrelevant or inapplicable instruction is generally ""'only a technical error which does not constitute ground for reversal."''"  (*People v. Cross* (2008) 45 Cal.4th 58, 67.)  Such errors are reviewed under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130 (*Guiton*).)[5]  We "affirm the judgment unless a review of the entire record affirmatively demonstrates a *reasonable probability* that the jury in fact found the defendant guilty *solely on the unsupported theory*."  (*Guiton, supra,* at p. 1130.)

The record indicates the jury was advised under CALCRIM No. 200 that some of the instructions might not apply, depending on their findings about the facts of the case, and the inclusion of a particular instruction did not mean the court was "suggesting

---

[5] Appellants' argument that a stricter standard of review applies is unfounded. The authorities they cite hold that a higher standard applies if an erroneous instruction would permit the jury to convict based on a factually insufficient scenario. (E.g., *People v. Aguilar, supra,* 16 Cal.4th at p. 1034.)  No such danger existed in this case.

19.

anything about the facts." The jury was also instructed to first determine what the facts were, then follow the instructions that applied to the facts as they found them. We presume the jury followed these instructions and ignored the inapplicable instructions. (*People v. Holloway* (2004) 33 Cal.4th 96, 152-153; *Guiton*, *supra*, 4 Cal.4th at p. 1131.

Appellants' theory of juror confusion depends upon a highly speculative and improbable chain of contingencies. The jury first needed to reach the conclusion that J.H. was the initial aggressor, which itself requires a great leap of faith to assume. Next, instead of ignoring CALCRIM No. 3471 as irrelevant since neither defendant was the initial aggressor, the jury would have had to fixate on the words "mutual combat," assign a counterintuitive meaning to that term, and consequently disregard all other instructions pertaining to self-defense and defense of others. Finally, despite believing J.H. started the fight (and that Martinez was the Good Samaritan), the jury needed to somehow still reach a unanimous conclusion that both defendants committed robbery and aggravated assault while acting with the required mens rea for each crime. The last step in this process is virtually impossible to conceptualize given the elements of those offenses.

In summary, Martinez and Ortiz fail to satisfy the burden of showing reversible error. The evidence supporting the verdicts is strong in comparison to the evidence supporting their claims of self-defense and defense of others, which was meager. There is no reasonable probability that the inclusion of the words "mutual combat" in the challenged instruction, without an accompanying definition, affected the outcome of the case. The ineffective assistance of counsel claims fail for the same reasons stated above.

**Failure to Instruct on Necessity**

The second allegation of instructional error is based on the lack of a jury instruction on the defense of necessity in relation to the robbery charge. Martinez and Ortiz argue the trial court had a sua sponte duty to provide such an instruction. As a fall-back position, both claim ineffective assistance of counsel arising from their attorneys' failure to make such a request.

20.

We begin our analysis by examining the elements of the offense in question. Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The crime also requires a specific intent to permanently deprive the victim of their property. (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)

At trial, appellants maintained that despite driving off with J.H.'s scooter, neither formed the requisite intent to rob him. Instead, their sole purpose in dispossessing J.H. of the scooter was to prevent its further use as a weapon against them. Appellants now claim they were entitled to an instruction on the doctrine of necessity in conjunction with this argument.

"The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime." (*People v. Beach* (1987) 194 Cal.App.3d 955, 971.) Because of its narrow applicability, trial courts do not easily allow a defendant to present the defense to a jury. "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)

Proving there was "no adequate alternative" to the crime is a particularly onerous requirement. The concept is best illustrated by contrasting necessity with the similar but distinct defense of duress. "Unlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time to balance alternative courses of conduct." (*People v. Heath* (1989) 207 Cal.App.3d 892, 901 (*Heath*).) Therefore, a person who acts out of necessity "has the time, however limited, to form the general intent required for the crime, although under some outside pressure." (*Ibid.*)

This aspect of the defense exposes the flaw in appellants' argument. As plainly stated in *Heath*, *supra*, "[t]he situation presented to the defendant must be of an emergency nature, threatening physical harm, *and lacking an alternative, legal course of action*." (*Id*. at p. 901, italics added.) Neither Martinez nor Ortiz showed the absence of an adequate alternative to breaking the law. The necessity doctrine cannot be invoked without admitting there was time to consider and choose between alternative courses of conduct. Here that would mean Martinez and Ortiz could have simply turned and run away, but instead chose to rob J.H. of his scooter. The availability of an adequate lawful alternative precludes the defense.

A trial court's duty to instruct sua sponte arises when there is substantial evidence in support of the proposed defense. (*People v. Barraza* (1979) 23 Cal.3d 675, 691.) Conversely, no such duty exists if there is insufficient evidence in the record to support the defense. (See, e.g., *People v. Miceli* (2002) 104 Cal.App.4th 256, 267 [no substantial evidence to support the second and fifth elements of necessity]; *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1165 [insufficient evidence to permit the trier of fact to find the elements of necessity].) "The standard for evaluating the sufficiency of the evidentiary foundation is whether a reasonable jury, accepting all the evidence as true, could find the defendant's actions justified by necessity." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1539.) As explained, the record in this case does not permit such a finding. We thus conclude there was no error by the trial court or the defense counsel.

**Section 654**

Martinez and Ortiz contest the trial court's imposition of concurrent sentences under Count 2. They argue the sentences should have been stayed pursuant to section 654 because the force used against J.H. during the robbery and the assault was part of an indivisible course of conduct. We find no error.

Section 654 prohibits multiple punishments for crimes arising out of a single act or indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) The statute

22.

provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) A defendant's intent and objective, rather than the "temporal proximity of his offenses," determines whether two crimes are part of an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

The applicability of section 654 "is a question of fact for the trial court, which is vested with broad latitude in making its determination. Its findings will not be reversed on appeal if there is any substantial evidence to support them. We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143, citations omitted.)

"When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) Such findings will also be upheld on appeal if supported by substantial evidence. (*Ibid.*)

Robbery and assault by means of force likely to produce great bodily injury can occur as part of the same incident and still be punished separately. (See, e.g., *In re Chapman* (1954) 43 Cal.2d 385, 389-390.) "'[A]t some point the means to achieve an objective may become so extreme they can no longer be termed "incidental" and must be considered to express a different and more sinister goal than mere successful commission of the original crime[.] Section [654] cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense.'" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 272, quoting *People v. Nguyen* (1988) 204 Cal. App. 3d 181, 191.)

23.

Appellants essentially argue they used force against J.H. after gaining possession of his scooter for the purpose of perfecting the robbery. The trial court viewed the facts differently. If taking and keeping the scooter was their sole intent, Martinez and Ortiz could have fled as soon as the item was in their possession. Instead, they continued fighting with the boy and used the scooter to hit him. Indulging all reasonable inferences in favor of the trial court's decision, we have no difficulty concluding that substantial evidence supports the finding of two separate objectives behind the use of force: (1) depriving the victim of his property and (2) inflicting harm upon him.

## RECOMMENDATIONS

The judgments are affirmed.

_____
Gomes, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Hoff, J.

24.